**In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.**

**No. 86 Civ. 6586 (MJL).**

United States District Court, S.D. New York.

Sept. 29, 1986.

Kramer, Levin, Nessen, Kamin & Frankel, New York City by Marvin E. Frankel, Geoffrey M. Kalmus, Joel B. Zweibel, Arthur H. Aufses, for appellants, the LTV Bank Group.

Davis Polk & Wardwell, New York City by Donald S. Bernstein, Karen E. Wagner, John R. D'Angelo, Harsha Murthy, and Levin Weintraub & Crames, New York City by Michael J. Crames, Herbert S. Edelman, Marc Abrams, for appellee, LTV Corp.

Stroock & Stroock & Lavan, New York City by Jack Gross, Lawrence M. Handelsman, Mark A. Speiser, Madelaine Berg, Mark I. Bane, for the Official Committee of Unsecured Creditors.

Cohen Weiss and Simon, New York City by Bruce H. Simon, Richard M. Seltzer, Babette Ceccotti, John S. Bishop, Sophia Davis, for United Steelworkers of America AFL–CIO–CLC.

Cornfield and Feldman, Chicago, Ill., Michael H. Holland, Washington, D.C. by Bruce Simon, for United Mine Workers of America.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

This is an expedited appeal by a group of twenty-two banks (the "Banks")[1] from an Order (the "Order") of the Bankruptcy Court (Lifland, J.). The Order authorized the debtors, LTV Corporation and 64 of its subsidiaries (together "LTV"), to temporarily resume payments of up to 70 million dollars for the health and life insurance benefits of approximately 66,000 retired workers (the "Retirees"). The Order expressly provided that any distributions ultimately due the Retirees under a plan of reorganization could be reduced by the amounts paid pursuant to the Order.

The Banks argue that the Order should be reversed as procedurally defective and contrary to law. The position is opposed by LTV, the Official Committee of Unsecured Creditors (the "Unsecured Creditors"), the United Steelworkers of America (the "Steelworkers") and the United Mine Workers of America (the "Mine Workers"). LTV and the Unsecured Creditors seek dismissal of this appeal or affirmance of the Order on the grounds that (1) the Order is interlocutory and not appealable, and (2) the Bankruptcy Judge properly exercised his equitable power to preserve and rehabilitate the debtors in an emergency situation. The Steelworkers and Mine Workers urge this Court to affirm on the additional ground that LTV did not have the power to terminate the retirees' life and health benefits in the first instance. There is also a dispute over the record on appeal.

We remand in order to enable the Bankruptcy Judge to make findings of fact and conclusions of law in completion of the decision-making process he initiated.

## BACKGROUND[2]

On July 17, 1986, LTV filed petitions for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978, as amended (the "Code"). Each debtor was continued in the management and possession of its business and properties as a debtor in possession pursuant to sections 1107 and 1108 of the Code. The cases are being jointly administered.

It has been estimated that at the time of its Chapter 11 petitions, LTV listed total assets of over six billion dollars and owed an aggregate of more than four and one-half billion dollars to approximately 20,000 creditors.

LTV is principally engaged in the steel, aerospace/defense and energy products industries. The Steel Group is fully integrated and the second largest steel operation in the United States. It is a major producer of hot and cold rolled sheets for the automotive and consumer durable goods mar-

1. The appellant Banks include: Manufacturer Hanover Trust Company, The Chase Manhattan Bank, N.A., Morgan Guaranty Trust Company of New York, Bankers Trust Company, Mellon Bank, N.A., Marine Midland Bank, N.A., Continental Illinois National Bank and Trust Company of Chicago, National City Bank, Security Pacific National Bank, Bank One of Columbus, N.A., National Bank of Detroit, The Philadelphia National Bank, First Wisconsin National Bank of Milwaukee, Pittsburgh National Bank, Inter-First Bank Dallas, N.A., Bank of Dallas, Ameritrust Company, National Association, Norwest Bank Minneapolis, N.A., First Pennsylvania Bank, N.A., First City Bank of Dallas, InterFirst Bank Houston, N.A., and The Royal Bank of Canada.

2. The events described below have been constructed out of the parties' submissions to this Court as well as those before the Bankruptcy Judge prior to the time he issued the July 30 Order. Those submissions do not include sworn affidavits. Nor has the Bankruptcy Court had an opportunity to conduct an evidentiary hearing on the issues now pending before this Court. Accordingly, the facts remain subject to determination by the Bankruptcy Judge on remand.

kets and of high quality bar products and seamless and welded tubular products for the oil and gas industry. The Aerospace Group designs and produces missile and rocket systems, space defense systems, commercial and military aircraft components, remanufactured aircraft, as well as specialized military vehicles. The Energy Group is a large supplier of energy products to the oil and natural gas drilling and production industries.

The Banks claim to have extended about $840 million of credit to LTV. All but $175 million is secured debt. The unsecured debt is held by 21 of the banks bringing this appeal and results from a revolving credit agreement with a member of the Aerospace Group.

In addition to owing money to the Banks, LTV owes money to its retired employees. LTV maintains several employee benefit plans for its active and retired workers. The plans provide for payment and reimbursement of health, medical, life insurance and related costs, including administrative costs, incurred by or on behalf of the Retirees. LTV estimates the aggregate cost of benefits under these plans to be $120 million per year for group health and life insurance premiums and direct payments to either Retirees or health care providers.

Upon filing for reorganization, LTV took the position that its obligation to provide benefits under the medical and health plans to Retirees derived from their pre-petition work for the debtors. LTV concluded that the Retirees held pre-petition unsecured claims which could not be paid absent a court order or under a confirmed plan of reorganization.

LTV stopped all payments in connection with the retiree benefit plans as of July 17, 1986. Letters from Retirees, submitted to the Bankruptcy Judge prior to July 30, indicate that LTV's decision caused enormous stress for the many elderly Retirees and their families who were left without medical or life insurance coverage.[3]

According to LTV, all steel-making operations ceased at the Indiana Harbor Works, LTV's most important and profitable steel facility. LTV was informed by counsel for the Steelworkers that the strike would be expanded to LTV's other principal steel plants.[4] LTV and the Unsecured Creditors apparently feared that a potentially crippling strike in the wake of the bankruptcy petitions would destroy customer confidence, undermine LTV's relationship with labor and ultimately obliterate any possibility of a successful reorganization.[5]

LTV met with the Steelworkers and on July 30, applied to the Bankruptcy Court for an order permitting LTV to restore retiree benefits for a six-month period at an estimated cost of $70 million upon termination of the strike.[6] According to LTV, a

---

**3.** Counsel for the Steelworkers has represented that as of July 30, at least one death had resulted from LTV's termination of insurance coverage. That individual had experienced a cardiac problem and was turned away by a hospital because he had no insurance. (August 19, 1986 Transcript of Proceedings Before the Hon. John M. Walker, hereinafter "Walker Tr.," p. 22).

**4.** Counsel for LTV has represented that the cumulative economic effect of the strike would be losses of "many tens of millions of dollars each month." (August 19, 1986 Transcript of Proceedings before the Hon. Burton R. Lifland, hereinafter "Lifland Tr." p. 10).

**5.** It has also been argued that the strike hampered the reorganization effort because it precluded LTV from taking advantage of the Steelworkers' simultaneous strike against USX, LTV Steel Company's largest competitor. But for the strike against LTV, LTV would have been in a position to benefit financially from USX's inability to meet production demands.

**6.** The Order signed by Judge Lifland, substantially the same as the one proposed by LTV, authorized the debtors to:
> pay Plan Benefits ... to or on behalf of the Retirees ... in accordance with the terms and conditions of their respective Retiree Medical and Life Plans ... provided that (a) the claims in respect of which any such payments are to be made shall have been incurred prior to January 17, 1987 and (b) reserving the Debtor's right to assert that the Debtors' obligations to pre-petition Retirees under the Retiree Medical and Life Plans constitute general unsecured claims which should be provided for by the Debtors in a plan or plans of reorganization, and that any post-Filing date payments by the Debtors to or on behalf of a Retiree under this Order shall be applied to

temporary resolution of the crisis was intended to provide enough time to reach a more permanent agreement with the Steelworkers on this and other labor-related issues.

LTV notified the Banks of its application by telephone at approximately 2:30 p.m. on July 30. LTV also notified counsel for two of the general unsecured creditors (one of whom is now counsel for the Unsecured Creditors), counsel for the Steelworkers and the United States trustee. The application for the Order (the "Application") was subsequently served by hand. For two and one half hours, beginning at about 5:15 p.m., the Bankruptcy Judge heard the parties in chambers. No transcript of the conference was made.

According to the recollection of LTV's counsel, there was discussion at the July 30 conference about whether an evidentiary hearing was necessary. LTV was prepared to put a witness on the stand to support its emergency application for the Order. The Bankruptcy Judge was ready to stay that evening to hear testimony. The parties, however, agreed that a hearing would not be needed that evening if the Banks were ultimately satisfied as to the reasons for LTV's request. If the Banks were not satisfied, a hearing date would be set.

The Bankruptcy Judge has expressed his agreement with the account provided by LTV's counsel and stated:

> ... the Court indicated at all times that it would accomodate anybody who wanted the hearing if they were not satisfied with the presentation at the time the Order was entered into. Nobody has ever asked for that hearing and, of course the Court would have assumed that there was satisfaction or a conceded

lack of need for the hearing or justification ... for the relief granted.

(Lifland Tr., p. 22).

While the Banks do not deny that the Bankruptcy Court was willing to hold an immediate or subsequent hearing on LTV's Application, their version of the July 30 conference is somewhat different. According to counsel for the Banks, he objected to the procedures being followed and requested a hearing prior to the entry of the Order but after longer notice.[7]

Regardless of the Banks' position at the July 30 conference, they in fact met with LTV during the ensuing week to discuss the reasons for LTV's action. (Walker Tr., p. 4). On August 11, 1986, the Banks sought and obtained an order extending their time to appeal the July 30 Order.

On August 19, twenty days after the Order was entered, the Banks filed a notice of appeal under Bankruptcy Rules 8001 and 8019 to this Court. On the same day, the Banks applied to the Bankruptcy Court for a stay pending the appeal of the July 30 Order.

After argument, the Bankruptcy Judge denied the application for a stay, finding that the irreparable harm to "thousands of ... people who are at least back on the lifeline with respect to resumption of their premiums" far outweighed any harm that might befall the Banks. (Lifland Tr., p. 13). Judge Lifland further stated that he had offered to hold an evidentiary hearing though the Banks did not take advantage of that opportunity. In addition, the Bankruptcy Court indicated that the relief granted had been temporary and that the legal questions raised by the Order had not yet been determined. *Id.*

Upon the denial of their application for a stay, the Banks on the same day made a similar application in Part I of this Court

---

reduce in an equal amount the distributions otherwise required to be made to or on behalf of such Retiree pursuant to the terms of the Debtors' plan or plans of reorganization in respect of the Debtors' obligations under the Retiree Medical and Life Plans ...

**7.** Counsel for the Banks "made it clear [to the Bankruptcy Court] that even if there were to be

a hearing [on July 30], we were not prepared to conduct same." (Lifland Tr., p. 16). Thus, counsel for the Banks effectively took the position that their procedural due process rights would be infringed if the Bankruptcy Judge acted on an emergency basis.

(Walker, J.). Judge Walker also declined to enter a stay, but ordered this expedited appeal.

## DISCUSSION

### A. *The Record*

The parties dispute the contents of the record on appeal. By letters dated August 27 and September 2, 1986, the Banks have requested that this Court strike four categories of documents which appellees have counter-designated as items for inclusion in the record on appeal. Those categories are:

(1) four orders of the Bankruptcy Court entered from July 17 to August 6 authorizing various expenditures and other acts by the debtors, none of which are challenged in this appeal;

(2) an affidavit of the treasurer of LTV, sworn to on July 17, 1986, and submitted to the Bankruptcy Court in conformity with local Bankruptcy Rule 52;

(3) a group of letters to the Bankruptcy Court from retired employees, received both before and after July 30;

(4) papers relating to the Banks' application for a stay of the July 30 Order.

There does not appear to be any real dispute about which items were considered by the Bankruptcy Judge in issuing the Order. Accordingly, none of the parties challenge this Court's jurisdiction to resolve the dispute over which items are properly included in the record on appeal. *See* Rule 10(e) of the Federal Rules of Appellate Procedure; *see also In re W.T. Grant Co.*, 432 F.Supp. 105, 107 (S.D.N.Y.), *aff'd,* 559 F.2d 1206 (2d Cir.1977).

Bankruptcy Rule 8006, which establishes the procedure for designating items to be included in the record on appeal, has been construed to mean that "the record on appeal should contain all documents and evidence bearing on the procedings below and considered by the bankruptcy judge in reaching his decision." *In re W.T. Grant Co.*, 432 F.Supp. at 106 (interpreting Rule 806, the predecessor of Rule 8006).

■ We agree with the Banks that items (1) and (2) above had no bearing on the Bankruptcy Court's decision to issue the Order and are not relevant to this appeal. We disagree, however, with respect to items (3) and (4) above.

■ The retirees' letters received by Judge Lifland before July 30 were clearly considered by him and are relevant to the question of harm raised by the Banks in this appeal.

■ The papers and transcripts relating to the Banks' August 19, 1986 application for a stay may be included in the record since they are: (a) "necessary to afford the reviewing court a complete understanding of the case," *In re Candor Diamond Corp.*, 26 B.R. 844, 846 (Bkrtcy.S.D.N.Y. 1983), and (b) "[m]aterial from related proceedings," *In re Candor Diamond Corp.*, 30 B.R. 17, 18 (Bkrtcy.S.D.N.Y.1983), *citing In re Food Fair, Inc.*, 15 B.R. 569, 572 (Bkrtcy.S.D.N.Y.1981). Accordingly, items (1) and (2) above are stricken from the record on appeal. Application to strike item (3) is granted only in so far as it relates to those letters received by the Court after July 30. Application to strike item (4) above is denied.

### B. *The Appeal*

In urging the reversal of the Bankruptcy Court's Order, the Banks make two main arguments: (1) that the Bankruptcy Judge deprived them of procedural due process by entering the Order without adequate notice, an evidentiary hearing, findings of fact and conclusions of law; and (2) that the Bankruptcy Judge violated the Code and its underlying policy of equal treatment for pre-petition creditors by authorizing LTV to pay the Retirees' pre-petition unsecured claims prior to the confirmation of a plan of reorganization.

In opposition, LTV and the Unsecured Creditors challenge the appealability of Judge Lifland's Order, arguing: (1) that it is not a final order; and (2) that since the appeal would not decide a controlling question of law, this Court should not grant

leave to appeal. In addition to their threshold argument, all of the appellees contend that the Bankruptcy Court's Order should be affirmed. LTV, the Unsecured Creditors and the Steelworkers argue that the Order was not procedurally defective since (1) the Banks were given adequate notice under exigent circumstances; (2) the Banks were afforded an opportunity to be heard which they declined; and (3) findings of fact and conclusions of law were not required of the court.

Regarding the substance of the Banks' legal claims, LTV and the Unsecured Creditors[8] agree with appellants that retiree benefits constitute unsecured pre-petition claims. The appellees, however, assert that by authorizing payment of the medical and health benefits in order to avert the continuation and expansion of the strike, the Bankruptcy Court properly exercised its inherent equitable power to preserve the debtors' estate in accordance with the rehabilitative goal of reorganization proceedings. In addition, the Steelworkers and Mine Workers assert that Judge Lifland's Order was not merely proper, but required by Section 1113 of the Code.[9] The unions claim that LTV had no right to unilaterally terminate retiree benefits which the debtors had agreed to provide under collective bargaining agreements. The Order, in their view, was simply a correction of LTV's unlawful act.

We first address the question of the appealability of the July 30 Order. Appeals from the Bankruptcy Court to the District Court are governed by 28 U.S.C. § 158 which provides that appeals may be taken from "final" orders and, with leave of Court, from interlocutory orders.

For an order to be appealable as of right it must contain "a final decision on the discrete issue at bar." *In re Stable Mews Associates*, 778 F.2d 121, 122 (2d Cir.1985).[10] An order is final if it resolves and terminates some aspect of the proceedings and irrevocably decides the rights of any party or a dispositive issue of law. *In re Johns-Manville Corp.*, 39 B.R. 234, 235 (S.D.N.Y.1984).

Judge Lifland's Order meets none of the above criteria. It did not terminate any aspect of the bankruptcy proceedings. It simply provided an interim compromise, pending further negotiations and decision by the Court, which would (1) satisfy the immediate physical needs of retired workers, some of whom might face life-threatening illness; and (2) reduce the threat to the reorganization posed by the strike. On its face, the Order provided for payment of only those benefit claims incurred prior to January 17, 1987. It therefore required the Court to address identical issues only six months later.[11] Even more important,

---

**8.** The Steelworkers argue this position in the alternative.

**9.** Section 1113 was added to the Code in 1984 in response to the United States Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which held that a collective bargaining agreement was an executory contract which could be unilaterally rejected by the debtor without violating the National Labor Relations Act. Under § 1113, a collective bargaining agreement remains "enforceable and binding upon both parties until a court-approved rejection or modification," 130 Cong.Rec. § 8898 (June 29, 1986) (Statement of Sen. Packwood), following good faith negotiations between the debtor and the union. The unions argue that under *In re Century Brass Products, Inc.*, 795 F.2d 265, 122 Lab. Rel.Rep. (BNA) 2833 (2d Cir.1986), retiree benefits are a proper subject of bargaining under § 1113 and that the collective bargaining agree-

ment which provides for those benefits is assumed by the debtor-in-possession in absence of a count-ordered modification.

**10.** While the finality requirement has traditionally been liberally applied in the bankruptcy context, the Second Circuit has indicated that the flexible approach may be limited to appeals taken under the old Bankruptcy Act and may not apply under the Code. *Stable Mews*, 778 F.2d at 122.

**11.** The Banks claim that this procedure is unfair because bankruptcy courts and litigants "will often find a way to fashion orders of a duration short of the entire reorganization proceeding and subject to renewal" which will "avoid finality and hence appellate review." (Reply Memorandum for the LTV Bank Group hereinafter "Reply Memo," p. 11). The Banks have not provided this Court with any reason to believe *that the July 30 Order has been intentionally*

however, is the context in which the Order was issued. The Bankruptcy Court clearly expressed its intent to resolve any factual or legal disputes arising from its Order in a hearing immediately upon the Banks' request. (Lifland Tr., p. 13). *See In re The Charter Co.,* 778 F.2d 617 (11th Cir.1985) (Bankruptcy Court's order was interlocutory where Court said that it would remain open to challenge and suggestions). The Banks' appeal effectively terminated the Bankruptcy Court's decision-making process.

Nor did the Order irrevocably decide the rights of any party or a dispositive issue of law. The Order does not definitively grant priority to the Retirees since it leaves open the possibility of a later set-off. By allowing LTV the right to assert the position that the Retirees are pre-petition unsecured claimants, the Bankruptcy Judge expressly left open the legal question which appellants ask this Court to decide.[12]

The Banks primarily argue that the July 30 Order is final because it authorizes LTV to transfer money which the appellants have no practical means of recovering. They rely on an Eighth Circuit case and a Supreme Court case decided almost 150 years ago.

The Banks contend that *In re Olson,* 730 F.2d 1109 (8th Cir.1984), establishes the test for determining finality. (Reply Memorandum, pp. 849) In *Olson* the Eighth Circuit applied three factors to decide whether a Bankruptcy Court's order was final: (1) the extent to which the order leaves the Bankruptcy Court nothing to do but to execute the order; (2) the extent to which delay in obtaining review precludes effective relief; and (3) the extent to which a later reversal would require recommencement of the entire proceeding. 730 F.2d at 1109.

The *Olson* Court held that a Bankruptcy Court's order directing payment of one creditor's claims and resolving the issue of a second creditor's priority was final. 730 F.2d at 1110. In *Olson,* unlike the case at bar, the appellant alleged that the creditor, whose claim was granted, was an alter ego corporation of the debtor used to siphon significant assets from the bankrupt-estate. 730 F.2d at 1109. The Bankruptcy Court's order in *Olson* did not expressly leave the legal status of the paid claim or the possibility of set-off open to future determination. Furthermore, the *Olson* case appears to involve a liquidation and not a reorganization proceeding.

Even if we were to apply the Eighth Circuit's finality standards to the instant case, our decision would be the same. We fail to see that effective relief will be denied if the Bankruptcy Judge is permitted to take evidence and decide the legal question in the first instance.[13] If the Banks remain dissatisfied with the Bankruptcy Court's decision they may again appeal. Furthermore, they have not shown how money expended in the temporary payment of benefits to individual claimants prior to such an appeal could not be subsequently

structured to evade review. Moreover, the Banks' speculation about the future behavior of bankruptcy judges is totally unfounded.

**12.** That Judge Lifland did not make any decision on the merits is clear from his remarks on August 19:

THE COURT: I think the [Second] Circuit indicated that at least under the circumstances of *In re Century Brass Products, Inc.,* [795 F.2d 65], 85–5092, slip op., (2d Cir. June 30, 1986—and I am not privy to all of the retiree benefits—were a 1113 event for negotiation, but found the union was in conflict in negotiating in that regard.

I do not know if that is necessarily controlling or not.

But it is certainly indicative of the fact that the Debtor's determination and now the agreement of the bank group that this is a purely prepetition obligation is not so crystal clear that it justifies choking off what amounts to a lifeline for many people who have articulated their desperation in correspondence to the Court on the subject, which both predates the requested relief that was embodied in the Order of July 30th and is before the Court in connection with the potential impact concerning a stay."

(Lifland Tr., pp. 12–13).

**13.** There is no reason to believe that the Banks' argument to Judge Lifland will be "fruitless," as the appellants suggest. (Reply Memorandum, p. 11).

recovered from the group of Retirees under the plan of reorganization.[14]

The Banks next argue that *Forgay v. Conrad*, 47 U.S. (6 How.) 201, 12 L.Ed. 404 (1848), establishes the rule that an order is final if it directs the immediate delivery of physical property and subjects the losing party to irreparable injury due to the delay of appellate review. *Forgay-Conrad* held that an order setting aside certain deeds as fraudulent and directing the delivery of land, money and slaves to the assignee in bankruptcy for the benefit of creditors was a final order. In *Forgay-Conrad*, the lower court decided the merits of the assignee's claim to the disputed property. All that remained was a master's report for an accounting of rents and profits.

The issues faced by Judge Lifland are entirely different. There is no question that the Retirees have some claim against LTV. After negotiation by the parties, the real task for the Bankruptcy Court will be to determine what type of claim the Retirees have, and how much it is worth. Though the Order provides retired workers with interim life and health insurance coverage, the nature and value of their claims has not yet been addressed let alone determined.

Moreover, the Banks have not shown how their interests will be irreparably harmed if their appeal is not heard at this time. Approximately 79 percent of the Banks' claims are secured. Though the Banks raise the spectre of LTV's reorganization effort ending in Chapter 7 liquidation, there has been no suggestion in appellants' submissions that the Banks are undersecured.

To the extent that the Banks are unsecured creditors, their interests are indistinguishable from the other unsecured creditors represented by the Official Committee.[15] In a footnote, the Banks suggest that they will be harmed if "the plan of reorganization (particularly for Steel) ... pay[s] unsecured creditors substantially less than one-hundred percent of their prepetition claims." (Memorandum for Appellants, the LTV Bank Group, hereinafter "Banks' Memorandum", p. 23). We fail to see the injury. To the extent the Banks are unsecured creditors, their claims are against the Aerospace Group. Furthermore, the possibility of offset explicitly provided in the Order can equalize the payout to unsecured creditors as long as the total value of the Retirees' claims cover the interim payments. The Banks have not shown that a shortfall is likely to occur.

The Banks cannot appeal Judge Lifland's Order as of right. We next consider whether an interlocutory appeal is justified in this case.[16]

An interlocutory order may be appealed when, in the discretion of the District Court, the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal ... may materially advance the ultimate termination of the litigation ..." 28 U.S.C. § 1292(b); *see In re Johns-Manville Corp.*, 39 B.R. 234, 236 (S.D.N.Y.1984).

The Banks seek to persuade this Court that their appeal poses "controlling questions of law" which should be decided by this Court without benefit of a record. At the same time, the Banks complain that the Bankruptcy Court failed to hold an evidentiary hearing and make findings of fact

---

**14.** For further analysis of this point, see *infra* discussion of irreparable injury.

**15.** The Unsecured Creditors favor the Order because they believe that it was necessary to avert economic disaster for LTV. While the Banks complain that the benefit payments which are coming out of "ordinary business operations" diminish the fund that will be used to pay their claims, the Unsecured Creditors realize that

without those benefit payments, there may be no "ordinary business operations."

**16.** Bankruptcy Rule 8001(b) requires the Banks to file a motion for leave to appeal along with their notice of appeal from an interlocutory order. The Banks have not filed a motion for leave to appeal. However, under Bankruptcy Rule 8003(c), this Court may consider the notice of appeal as a motion for leave to appeal.

before issuing the emergency Order.[17] In their Memorandum of Law, the Banks list eight factual representations and the factual questions which they apparently believe are significant to the determination of whether interim benefits may be paid to Retirees. (Banks Memorandum, pp. 33–34).

■ This Appeal does not present controlling questions of law. Whether or not the Bankruptcy Court may authorize LTV to temporarily continue to pay for the health and life benefits of its retired workers does not require the Court to decide the nature and value of the Retirees' claims. The question on appeal is not whether Section 1113 of the Code and *In re Century Brass Products, Inc.*, 795 F.2d 265, 122 Lab.Re.Rep. (BNA) 2833 (2d Cir.1986), establish the Retirees' right to continued coverage in the absence of court-ordered rejection or modification of the collective bargaining agreement, though the Bankruptcy Judge may decide that question. Nor is it up to this Court to say at this time whether the Retirees are, in fact, pre-petition unsecured creditors. The simple question presented on this appeal is whether the Bankruptcy Judge had the equitable power, consistent with the rehabilitative purpose of reorganization proceedings, to issue the emergency order in question. That is not a question which will control or materially advance the outcome of the largest bankruptcy petition ever filed in the United States.

■ While appeal is not appropriate at this time, either as of right or by leave of Court, remand is required to enable the Bankruptcy Judge to complete the decision-making process begun on July 30 and to make findings of fact and conclusions of law. The Banks argue that the Order should be reversed on procedural grounds. We disagree.

Bankruptcy Rule 9014 provides that in a contested matter, "relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought." "Notice and hearing" are defined in section 102 of the Code as follows:

"(A) ... such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances...."

11 U.S.C. § 102(1)(A).

The Code also provides that an act may be done without an actual hearing if:

"... there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act...."

11 U.S.C. § 102(1)(B)(ii).

We find that the notice given the Banks prior to LTV's application was sufficient in light of counsel's representations to the Bankruptcy Judge that the Retirees and LTV were in crisis. The Court's decision to delay holding an evidentiary hearing to enable the Banks to discuss the issue with LTV and determine whether there was an actual dispute was also proper under the Code, particularly in view of the explicit understanding that a hearing would be held upon the Banks' request.

■ Bankruptcy Rule 9014 also provides that "unless the court otherwise directs," Bankruptcy Rule 7052 applies. Rule 7052 states that Fed.R.Civ.P. 52 applies in adversary proceedings. Fed.R.Civ.P. 52 requires the court to make findings of fact and set forth conclusions of law. Judge Lifland did not direct that Rule 7052 not apply. In fact, he intended to make findings of fact and give reasons for his decision if the Banks requested a hearing.

Rather than evidencing procedural fatalities, the sparsity of the Bankruptcy Court record reflects the prematurity of the Banks' appeal to this Court. Since Judge Lifland clearly intended to hold a hearing to enable him to make findings of fact and

---

17. The question of whether there was an emergency is itself a factual issue better left to the Bankruptcy Judge. On remand, the Bankruptcy Court should make findings as to the existence of the emergency and well as the feasibility of alternatives to the Order authorizing interim payment of retiree benefits, *i.e.* the possibility of a *Boys Market* injunction.

**1000**

reach conclusions of law in the event of a dispute, this case is remanded to provide him with the opportunity to do so.

REMANDED.

It Is So Ordered.