In re CHATEAUGAY CORPORATION,
Reomar, Inc., the LTV Corporation,
et al., Debtors.

The OFFICIAL COMMITTEE OF UNSE-
CURED CREDITORS OF LTV AERO-
SPACE AND DEFENSE COMPANY,
INC.,

v.

The OFFICIAL COMMITTEE OF UNSE-
CURED CREDITORS OF LTV STEEL
COMPANY, INC., and Chateaugay Cor-
poration, Reomar, Inc. the LTV Corpo-
ration, et al., Defendants.

No. 91 Civ. 8373 (DNE).

United States District Court,
S.D. New York.

July 7, 1992.

Hertzog, Calamari & Gleason, New York, N.Y., Carla E. Craig, Steven M. Schwartz (William, Cutler & Pickering, Washington, D.C., William J. Perlstein, Patrick J. Carome, Stephen M. Cutler, Gregory S. Lane) of counsel for appellant the Official Committee of Unsecured Creditors of LTV Aerospace and Defense Company.

Stroock & Stroock & Lavan, New York, N.Y., Mark A. Speiser, Brian M. Cogan, Mark S. Winter, Lisa Peck and Wachtell Lipton Rosen & Katz, New York, N.Y., Leonard M. Rosen, Harold S. Novikoff, of counsel for appellee the Official Committee of Unsecured Creditors of LTV Steel Company, Inc.

Pension Benefit Guarantee Corporation, Washington D.C., Carol Connor Flowe, James J. Armbruster, Asst. Gen. Counsel, Paula J. Connelly (Steptoe & Johnson, Charles G. Cole and Otterbourg, Steindler, Houston & Rosen, William Silverman) of counsel.

Blank, Rome, Comiskey & McCauley, Philadelphia, Pa., Thomas E. Biron, Raymond L. Shapiro, William E. Taylor, III, of counsel for the Parent Creditor's Committee.

## OPINION & ORDER

EDELSTEIN, District Judge:

The Official Committee of Unsecured Creditors of LTV Aerospace and Defense Company (the "Aerospace Committee") filed this appeal from the Bankruptcy Court's November 5, 1991 order. For the reasons stated below, the appeal is dismissed.

### I. BACKGROUND

Familiarity with the Byzantine path of this bankruptcy proceeding is assumed. Some background will be discussed, however, in order to place this appeal in the context of this entire bankruptcy proceeding. The LTV Corporation ("LTV") is a conglomerate whose business is concentrated in the steel, aerospace, and energy production industries. LTV's steel subsidiary is LTV Steel Company, Inc. ("LTV Steel"), which was created by the merger of Jones & Laughlin Steel Company, Youngstown Sheet and Tube Company, and Republican Steel Corporation. LTV also has an aerospace and defense subsidiary, LTV Aerospace and Defense Company, Inc. ("LTV Aerospace").

On July 17, 1986 and thereafter, LTV and sixty-six affiliated companies (collectively the "Debtors"), including LTV Steel and LTV Aerospace, filed petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* This filing has been described as "the largest bankruptcy petition ever filed in the United States." *In re Chateaugay Corp.*, 64 B.R. 990, 999 (S.D.N.Y.1986). The Chapter 11 cases have been procedurally, but not substantively, consolidated and are being jointly administered by Chief Bankruptcy Judge Burton R. Lifland. Because the cases have not been substantively consolidated, claims asserted against any one of the debtors apply only against the assets of that debt-

or. *See* 5 *Collier on Bankruptcy* (15th ed. 1991) ¶ 1100.06 at pp. 1100–33 and ¶ 1100.7 at pp. 1100–1150 to 1100–1151.

A principal reason for the Debtors' bankruptcy filings was their inability to meet their pension obligations. *See PBGC v. LTV Corp.,* 496 U.S. 633, 640, 110 S.Ct. 2668, 2673, 110 L.Ed.2d 579 (1990). The largest of these obligations arose from four pension plans that were sponsored by LTV Steel, including the Jones & Laughlin Hourly Pension Plan (the "J & L Hourly Plan") at issue in this appeal. After the Chapter 11 filings, the Pension Benefit Guaranty Corporation (the "PBGC")[1] moved in the District Court for the Southern District of New York (the "District Court") to terminate the four LTV pension plans under the involuntary termination provisions of Title IV of the Employment Retirement Income Security Act ("ERISA"). 29 U.S.C. §§ 1301–1461. As administrator of the Plans, LTV consented to each of the terminations, and termination orders were entered in September 1986 and January 1987. Then, on September 22, 1987, the PBGC attempted to restore three of the terminated plans, including the J & L Hourly Plan, by issuing a notice of restoration.[2] Years of litigations ensued.

The District Court vacated the notice of restoration. *See In re Chateaugay Corp.,* 87 B.R. 779 (S.D.N.Y.1988). The Second Circuit affirmed the District Court's decision, agreeing with the District Court's finding that the PBGC's attempted restoration was arbitrary and capricious. *See PBGC v. LTV Corp.,* 875 F.2d 1008 (2d Cir.1989). The Supreme Court, however, reversed, holding that the PBGC's attempted restoration was not arbitrary and capricious as a matter of administrative law. *See PBGC v. LTV Corp.,* 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). The District Court then issued a judgment enforcing the September 1987 restoration notice. *Pension Benefit Guaranty Corp. v. LTV Corp.,* 122 B.R. 863 (S.D.N.Y.1990).

The PBGC has filed proofs of claim for the Debtors' liabilities in connection with the terminated plans. In September 1989, Honorable Kevin T. Duffy granted the PBGC's motion to withdraw the reference of the proceeding, but referred the action back to the Bankruptcy Court for recommended findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1). *In re Chateaugay Corp.,* 108 B.R. 27, 29 (S.D.N.Y.1989). The Bankruptcy Court found that the PBGC's claims arose from the pre-petition work of LTV Steel's employees or retirees. These claims were therefore found to constitute pre-petition general unsecured claims which were not transformed, by virtue of the PBGC's post-petition termination of the plans, into post-petition or administrative claims. *In re Chateaugay Corp.,* 115 B.R. 760 (Bankr. S.D.N.Y.1990). The District Court adopted the Bankruptcy Court's recommended findings of fact and conclusions of law. *In re Chateaugay Corp.,* 130 B.R. 690 (S.D.N.Y. 1991).

On August 24, 1990, the Debtors, represented by the Parent Creditors' Committee of the LTV Steel Corporation (the "Parent Committee"), initiated an action in the Bankruptcy Court against the Department of Labor. The Debtors' action sought a declaratory judgment prohibiting contributions to the LTV Steel pension plans based on pre-petition services. In addition, the action sought to expunge, reduce, or reclassify certain claims filed by the Department of Labor. Judge Duffy withdrew the reference of that action and consolidated it with the action concerning the PBGC's claims. The Department of Labor moved for a preliminary injunction compelling the Debtors to continue funding the Plan. The District Court denied the motion. *In re Chateaugay Corp.,* 130 B.R. 690 (S.D.N.Y. 1991).

While litigation continued, the Debtors and PBGC negotiated an agreement which

---

**1.** The PBGC is a wholly owned United States government corporation established under § 4002 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1302, to administer the pension insurance program in Title IV of ERISA, 29 U.S.C. §§ 1301–1461. *See*

*PBGC v. LTV Corp.,* 496 U.S. 633, 636, 110 S.Ct. 2668, 2671 (1990).

**2.** The fourth LTV Steel pension plan, which was not restored, exhausted its assets and was terminated in September 1986.

contemplated that the restored pension plans would be maintained by the Debtors but would allow the Debtors an extended period, up to 30 years, in which to fund the pension plans. On May 1, 1991, the Debtors proposed a joint plan of reorganization built around the conditional agreement with the PBGC. Fundamental to that agreement, however, was the Debtors' obligation to seek Bankruptcy Court authority to make limited payments to the J & L Hourly Plan. Without such payments, the J & L Hourly Plan would have run out of assets by the end of August 1991. In that event, the J & H Hourly Plan would have been subject to mandatory termination under Section 4042(a) of ERISA, which requires the PBGC to terminate a pension plan that is without assets to pay current benefits.

The Debtors therefore applied to the Bankruptcy Court for authority to contribute three months of benefits to the plan. The Bankruptcy Court approved a contribution of two months of benefit payments and found that such payment was "necessary to the process of developing a plan of reorganization." June 10, 1991 order, Appendix to Brief of Appellant ("App.") at 362. The Bankruptcy Court's order approving the payment provided that "such immediate payment with interest thereon shall constitute a direct offset against any distribution later made to the J & L Hourly Plan ... [and the other restored plans], or to the Pension Benefit Guaranty Corporation with respect to any of the Restored Plans, under any settlement agreement or plan of reorganization or otherwise." *Id.*

The Steel Committee then sought an expedited appeal of the June 10, 1991 order. Before the appeal was argued, a settlement agreement with the Debtors was reached under which Cold Spring Management, Inc., a creditor of LTV Aerospace and a predecessor-in-interest to the Aerospace Committee, and the Steel Committee each agreed not to oppose any application supported by the Debtors to fund the J & L Hourly Plan in amounts necessary to enable the plan to pay benefits through November 30, 1991. The Debtors, in turn, agreed that they would not seek authorization to make additional payments to the J & L Hourly Plan beyond November 30, 1991, without the consent of the Steel Committee and the Aerospace Committee.

According to the parties to this appeal, the imminent exhaustion of funds in a major LTV pension plan had a prompt and dramatic impact on negotiations between the parties. As a result of these negotiations, the Steel Committee and the PBGC reached an agreement in principle and initialled a term sheet, based upon a modification of the proposed plan of reorganization that the Debtors had filed in May 1991.

As was the case with the preliminary agreements between the Debtors and the PBGC, the agreement in principle between the Steel Committee and the PBGC was conditioned on, among other things, the continued funding of the J & L Hourly Plan. On October 31, 1991, the Steel Committee sought an order from the Bankruptcy Court authorizing LTV Steel to make immediate payment to the J & L Hourly Plan equal to the payments expected to be due under the plan over the ensuing six months. The Steel Committee also sought authorization for LTV Steel to make monthly contributions thereafter to the J & L Hourly Plan, subject to the occurrence of certain events, in sufficient amounts to fund benefits due in each month through June 1992.

At a hearing on November 4, 1991, the Steel Committee, the Debtors and the PBGC reported to the Court that they intended to work together in order to reach a definitive settlement and file a revised plan of reorganization encompassing that settlement. On November 5, 1991, the Bankruptcy Court signed an order (the "November 5th Funding Order"), which authorized LTV Steel to make immediate payment to the J & L Hourly Plan equal to three months of benefit payments and thereafter, subject to certain conditions, to make monthly contributions through September 1992. *See* November 5, 1991 order, App. at 131. The Bankruptcy Court found that such contributions were "necessary to the process of developing a plan of reorganization for the LTV Corporation and its affiliates." *Id.* at 132. An integral part of the

November 5th Funding Order is a dollar for dollar set-off provision (the "set-off provision"), which states that "all payments with interest thereon shall constitute a direct dollar for dollar offset against any distribution payable to the J & L Hourly Plan ... or to the PBGC with respect to any Restored Plans, as appropriate, under any settlement agreement or plan of reorganization or otherwise." *Id.* at 133. In addition, the Order states that "no creditor of LTV Steel has objected to the [Steel Committee's] Application." *Id.* at 132.

The Aerospace Committee then filed this appeal. The Aerospace Committee asks this Court to reverse the Bankruptcy Court's November 5th Funding Order and direct the Bankruptcy Court to bar the Debtors from making further payments to the J & L Hourly Plan except in the context of a properly presented and confirmed plan or reorganization. The Steel Committee contends that the Aerospace Committee does not have standing to file this appeal. The PBGC joins the Steel Committee in arguing that the Aerospace Committee does not have standing to challenge the November 5th Funding Order. In addition, the PBGC offers a number of other arguments for either dismissing the appeal or affirming the November 5th Funding Order. The Parent Committee also presented several arguments justifying the funding order on the merits.

■ This Court finds that the Aerospace Committee does not have standing to challenge the November 5th Funding Order. A party to a bankruptcy proceeding has standing to appeal a bankruptcy court order only if the order directly affects that party's pecuniary interests. Even though the creditors of LTV Aerospace are not creditors of LTV Steel, the Aerospace Committee claims that the November 5th Funding Order directly affects the pecuniary interest of the creditors of LTV Aerospace because they have a stake in how all the LTV estates are managed, they have a claim for contribution against LTV Steel, and their ability to receive cash will be affected by the order. These interests,

however, in the context of this case, are too indirect to confer standing to appeal a bankruptcy court's order. To hold otherwise would open a Pandora's Box of bankruptcy proceeding evils, including endless appeals from parties indirectly affected by the numerous orders required to conduct a bankruptcy proceeding, delay in the administration of bankruptcy proceedings due to such appeals, and unnecessary litigation in the District Courts and Courts of Appeals.

## II. DISCUSSION

■ A district court's jurisdiction over appeals from the bankruptcy court is governed by 28 U.S.C. § 158(a), which provides:

The district courts of the United States shall have jurisdiction to hear appeals from final judgements, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.

The standard for what constitutes a "final" order for purposes of 28 U.S.C. § 158(a) is less rigid than in typical civil litigation. *In re Financial News Network, Inc.,* 931 F.2d 217, 220 (2d Cir.1991); *In re Chateaugay Corp.,* 922 F.2d 86, 90 (2d Cir.1990); *In Re Johns–Manville Corp.,* 824 F.2d 176, 179 (2d Cir.1987). The different standards reflect "the fact that a bankruptcy proceeding is umbrella litigation" often involving a number of actions related only by the debtor's status as a litigant and "that often involve decisions that will be unreviewable if appellate jurisdiction exists only at the conclusion of the bankruptcy proceeding." *In re Sonnax Indus.,* 907 F.2d 1280, 1283 (2d Cir.1990). Orders in bankruptcy cases may be deemed "final" if they " 'finally dispose of *discrete disputes within the larger case.*' " *In Re Johns–Manville Corp.,* 920 F.2d 121, 126 (2d Cir.1990) (quoting *In re Saco Local Dev. Corp.,* 711 F.2d 441, 444 (1st Cir.1983) (emphasis in original)); *see In re Chateaugay Corp.,* 922 F.2d at 90; *In re Moody,* 817 F.2d 365, 367–68 (5th Cir.1987). A final order in a bankruptcy proceeding resolves or termi-

nates a particular proceeding or controversy within the entire bankruptcy proceeding and irrevocably decides a dispositive issue of law or the rights of any party. *Michigan Bureau of Workers' Disability v. Chateaugay Corp.*, 80 B.R. 279, 282–83 (S.D.N.Y.1987); *In re Chateaugay Corp.*, 64 B.R. 990, 996 (S.D.N.Y.1986); *In Re Johns–Manville Corp.*, 39 B.R. 234, 235 (S.D.N.Y.1984).[3]

■ A party who seeks to appeal an order of the bankruptcy court must meet the threshold requirement for standing, which means the party must be " 'directly and adversely affected pecuniarily' " by the challenged order. *Cosmopolitan Aviation Corp. v. New York State Dep't of Transp.*, 763 F.2d 507, 513 (2d Cir.) (quoting *In re Fondiller*, 707 F.2d 441, 443 (9th Cir.1983)), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985). Although the Bankruptcy Code of 1978, 11 U.S.C. § 101 *et seq.* (1982 & Supp. I 1983), does not contain an explicit limitation on appellate standing, courts have uniformly adopted the "person aggrieved" standard from Section 39(c) of the Bankruptcy Act of 1898 to fill the void. *See Kane v. Johns–Manville Corp.*, 843 F.2d 636, 641–42 (2d Cir.1988) (citing cases). That standard permits only a "person aggrieved" to appeal an order of the bankruptcy court. 11 U.S.C. § 67(c) (1976) (repealed 1978). The adoption of such a standard reflects "the understandable concern that if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad parties who are indirectly affected by every bankruptcy court order." *Kane v. Johns–Manville Corp.*, 843 F.2d at 642; *see In re Fondiller*, 707 F.2d 441, 443 (9th Cir.1983). In sum, a party to a bankruptcy proceeding "is permitted to appeal a particular order

only if the order directly affects his pecuniary interest." *Kane v. Johns–Manville Corp.*, 843 F.2d at 642.[4]

■ Under the "person aggrieved" standard, creditors to an estate generally have standing to appeal orders of the bankruptcy court disposing of property of the estate because such orders directly affect the creditors' ability to collect on their claims. *Id.* Usually, such appeals deal with plans of reorganization that adversely affect creditors due to the allocation of the estate among creditors and the extent to which each group is paid. *Id.; see In re Commercial W. Fin. Corp.*, 761 F.2d 1329, 1335 (9th Cir.1985). Meanwhile, a "hopelessly insolvent debtor" lacks standing to challenge orders affecting the estate because the estate will go entirely to the creditors. A bankruptcy court order affecting the estate, therefore, would not "diminish the debtor's property, increase his burdens, or detrimentally affect his rights." *In re Fondiller*, 707 F.2d at 442; *see In re Cosmopolitan Aviation Corp.*, 763 F.2d at 513. Standing has also been denied to marginal parties in bankruptcy proceedings "who face potential harm incident to the bankruptcy court's order but are not directly affected by them." *Kane v. Johns–Manville Corp.*, 843 F.2d at 642 n. 3; *see, e.g., In re Fondiller*, 707 F.2d at 443 (debtor's wife may not appeal order appointing special counsel even if counsel may sue wife); *In re San Juan Hotel*, 809 F.2d 151, 155–56 (1st Cir.1987) (former trustee may not appeal order granting leave to United States to sue him for breach of fiduciary duties).

This case presents a unique set of circumstances for application of the "direct affect to pecuniary interest" standard. The payments authorized by the November 5th Funding Order are to be made from the estate of LTV Steel. In fact, the Bank-

---

**3.** If a bankruptcy court order is not final, parties may appeal from interlocutory orders with leave from the court. *See* 28 U.S.C. § 158(a). A district court may grant leave to appeal when a district judge is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see In re Chateaugay Corp.*, 64 B.R.

990, 998 (S.D.N.Y.1986); *In Re Johns–Manville Corp.*, 39 B.R. 234, 235 (S.D.N.Y.1984).

**4.** The standing requirement to appeal a bankruptcy court order is therefore stricter than the "case or controversy" standing requirement imposed by Article III. Under Article III, the alleged injury "need not be financial and need only be 'fairly traceable' to the alleged illegal action." *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 642 n. 2 (2d Cir.1988) (citations omitted).

ruptcy Court entered the November 5th Funding Order upon a motion made by the Steel Committee, the fiduciary representative of all of the creditors of LTV Steel. Any risk created by the November 5th Funding Order is borne by the creditors of LTV Steel. The set-off provision in the November 5th Funding Order, however, seeks to alleviate the risk to the creditors of LTV Steel and to any other creditors should a unitary plan of reorganization eventually be adopted. None of the creditors of LTV Steel have objected to the payments.

Because the Debtors cases have not been substantively consolidated and no unitary plan of reorganization has been adopted, the creditors of LTV Aerospace only have claims against the estate of LTV Aerospace; they are not creditors of LTV Steel. Nonetheless, the Aerospace Committee makes three arguments to support its assertion that they have standing to challenge the November 5th Funding Order. The Aerospace Committee argues that it has standing because: (1) the creditors of each estate have a stake in how all the estates are managed; (2) the creditors of Aerospace have filed a claim for contribution against LTV Steel and are therefore creditors LTV Steel; and (3) the payment of cash pursuant to the November 5th Funding Order will materially affect the ability of the Aerospace creditors to receive a cash distribution. Each of these arguments will be addressed in turn.

### 1. *Each Creditor is not Affected by Each Estate*

■ The Aerospace Committee argues that even though the Debtors cases have not been substantively consolidated, it is incorrect to believe that each creditor body will be paid only from the assets of its own estate. To support this assertion, the Aerospace Committee points to the Debtors' plan of reorganization, the Parent Committee's plans of reorganization, and the Steel Committee's agreement with the PBGC, all of which provide for a unitary plan of reorganization that combines some or all of the Debtors' estates. These proposed unitary plans all provide for the combination of the LTV Steel and LTV Aerospace estates. The Aerospace Committee argues that if one of these unitary plans is adopted and the separate estates combined, the creditors of LTV Aerospace would then have a direct stake in the assets of the newly combined estate.

While the creditors of Aerospace might very well have a stake in the distribution of assets from a combined estate, there is no combined estate. No unitary plan of reorganization has been adopted. Moreover, the notion that a unitary plan will be adopted is purely speculative. Indeed, the Aerospace Committee's own brief has a section entitled, *"Absence of Confirmed Plans of Reorganization."* Brief of Appellant at p. 9. This section points out that even though these proceedings are approximately six years old, "no plan of reorganization has been confirmed in any of the Debtor cases." *Id.* The section further states that the unitary plan of reorganization proposed by the Debtor "has been characterized by the Bankruptcy Court as 'not realizable.'" *Id.* (quoting Transcript of Hearing, Nov. 4, 1991, at 100 (App. at 107)). The brief also points out that the Debtors' plan "is strongly opposed by the creditors," and the Parent Committee's plan "has failed, at least thus far, to gain support from any of the other creditor constituencies in this case." *Id.* In addition, as the Aerospace Committee's Reply Brief notes, the agreement between the Steel Committee and the PBGC may not be carried out. Reply Brief of Appellant at p. 19 n. 27.

Adopting the Aerospace Committee's argument endows any creditor to an estate in these procedurally, but not substantively, consolidated cases with standing to appeal any order solely on the basis that, if a unitary plan is adopted, the order might affect any one of the other estates. Such a theory permits standing based on the speculative premise that a unitary plan of reorganization will be adopted. In fact, this premise, as even the Aerospace Committee acknowledges, may never come to fruition. Clearly, allowing standing here is inconsistent with the "direct affect to pecuniary interest" standard and the policies that underlie this standard.

If a unitary plan that combines the assets of LTV Steel and LTV Aerospace is eventually adopted, the creditors of LTV Aerospace will have the opportunity to challenge the plan and the allocation of any funds from the unified estate. At this point, however, the creditors of LTV Aerospace do not have a direct stake in the contribution of funds from the estate of LTV Steel to the J & L Hourly Plan as authorized by the November 5th Funding Order.

## 2. The Claim for Contribution does not Transform the Creditors of Aerospace into Creditors of LTV Steel

Under ERISA, members of a "controlled group" are jointly and severally liable for "unfunded benefit liabilities." ERISA § 4062(b), 29 U.S.C. § 1362(b). A "controlled group" is a group of affiliated businesses, such as a parent corporation and its subsidiaries, that are treated as "employers" for certain purposes under ERISA. *See* 29 U.S.C. §§ 1082(c)(11)(B); 1301(a)(14); 1301(b); 1362(a). As a result of LTV Aerospace's joint and several liability for the LTV Steel pension plans, the creditors of LTV Aerospace have filed a claim for contribution against LTV Steel. The Aerospace Committee points to the Second Circuit's decision in *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12 (2d Cir.1991), to support the viability of the claim for contribution. According to the Aerospace Committee, this contribution claim transforms creditors of LTV Aerospace into creditors of LTV Steel.

The fundamental flaw in this line of reasoning is that *Chemung* does not provide for a right of contribution among controlled group members for unfunded pension liability. While the Second Circuit stated in *Chemung* that "ERISA does not preclude a cause of action for contribution or indemnification," *Id.* at 13, it found only that a right of contribution exists among defaulting fiduciaries. *Id.* at 16. In reaching this conclusion, the Second Circuit found that it was appropriate to develop common law under ERISA, and, in doing so, that it is to "be guided by traditional principles of trust law." *Id.* Applying traditional principles of trust law, the Second Circuit found that "the right of contribution among co-trustees [which] has been for over a century, and remains, an integral and universally-recognized part of trust doctrine." *Id.*

While contribution among co-trustees has been an integral part of trust doctrine for well over a century, there is no legal precedent regarding a right of contribution among controlled group members for unfunded pension liability. As far as this Court can tell, the only court directly to address this issue is the First Circuit, which ruled in *PBGC v. Ouimet Corp.*, 711 F.2d 1085 (1st Cir.1983), that no such right of contribution exists.[5] Thus, it does not appear that the creditors of Aerospace have a claim for contribution.

Even if the creditors of Aerospace had a viable claim for contribution, the claim is prospective; the LTV Aerospace estate has paid nothing to date. The possibility of a future claim of contribution based on future events is too speculative a ground on which to base standing. Moreover, LTV Steel's contribution pursuant to the November 5th Funding Order reduces the liability the LTV Aerospace estate faces as a joint and several obligor.[6]

---

**5.** At issue in *PBGC v. Ouimet Corp.*, 711 F.2d 1085 (1st Cir.1983), was ·the termination of an unfunded pension plan sponsored by two bankrupt subsidiaries of a controlled group with continuing viable subsidiaries. In holding that no Congressional policy or objective justified the imposition of a right of contribution in favor of the solvent affiliates against the direct sponsors of the plan, the First Circuit found that relevant provision of ERISA "do not support the conclusion that as between controlled affiliates who are to be treated as a single employer and the direct employer's creditors the loss is to be absorbed by the creditors." *Id.* at 1091. The court went to state that the right of contribution would conflict "with the congressional intent of holding employers accountable for the pension benefits they promise [in order] to ensure that employees can safely rely on these promises in their retirement planning." *Id.* at 1092. Moreover, the court found that "[t]his type of accountability is central to ERISA's primary goal of protecting employee benefits." *Id.* at 1093.

**6.** The issue of whether federal common law provides a right of contribution under ERISA

**802**

### 3. The Loss of Cash Does Not Confer Standing

■ The Aerospace creditors, as general unsecured creditors, have no right to payment of cash. Only priority claimants are entitled to payment in cash on the effective date of a confirmed plan of reorganization. 11 U.S.C. § 1129(a)(9). The creditors of Aerospace have asserted no priority for their claims. However, to the extent that cash is available for distribution, the Bankruptcy Code provides that it be distributed equally among unsecured creditors. 11 U.S.C. § 1129(b).

■ The Aerospace Committee argues that the funding authorized by the November 5th Funding Order will affect the ability of the creditors of LTV Aerospace to receive cash distributions. Once again, this argument is based on the assumption that there will be, at some time in the future, a unitary plan of reorganization that consolidates all of the Debtors' cash and other assets. While the Aerospace Committee may well prove to be mantic, the possibility of a unitary plan of reorganization is too speculative and indirect to confer standing. Moreover, the Aerospace Committee does not argue that its distribution will be diminished, but only that it will not receive as much cash as it might otherwise. Such an interest, standing alone, is too indirect to confer standing.

### III. CONCLUSION

The creditors of LTV Aerospace are not creditors of LTV Steel. At this time, the Debtors' cases have not been substantively consolidated and no unitary plan of reorganization has been adopted. The Aerospace Committee's arguments are premised on the possibility of a unitary plan of reorganization. Such a possibility, however, does not give the creditors of each estate in these procedurally consolidated Chapter 11 cases an interest in every other estate. The claim for contribution and the desire for cash also do not give the creditors of Aerospace a direct pecuniary interest in the November 5th Funding Order. At best,

among controlled group members for unfunded pension liability has not been fully briefed by the parties, and need not be settled here. The

the interests asserted by the Aerospace Committee on behalf of the creditors of Aerospace put them on the same footing with other marginal parties who have been denied standing in bankruptcy proceedings because they "face potential harm incident to the bankruptcy court's order but are not directly affected by them." *Kane v. Johns–Manville Corp.*, 843 F.2d at 642 n. 3.

In sum, the creditors of Aerospace are not directly and adversely pecuniarily affected by the November 5th Funding Order. Accordingly, the Aerospace Committee's appeal from the Bankruptcy Court's order of November 5, 1991, is dismissed for lack of standing.

SO ORDERED.

claim for contribution by the creditors of Aerospace is too indirect to confer standing.