**In re GF CORPORATION, Debtor.**

**In re GF FURNITURE SYSTEMS, INC., Debtor.**

**Bankruptcy Nos. 490–00621, 490–00622.**

United States Bankruptcy Court, N.D. Ohio.

June 7, 1990.

---

Michael A. Gallo, Youngstown, Ohio, for GF Corp. and GF Furniture Systems, Inc.

Michael Molinaro, Chicago, Ill., for C.T. Ten, L.P.

Richard G. Smolev, Chicago, Ill., for Sanwa Business Credit Corp.

David M. Fusco, Cleveland, Ohio, for United Steelworkers of America, AFL–CIO, CLC and All USWA Retirees.

Harry W. Greenfield, Cleveland, Ohio, for Official Creditors Committee.

Staughton Lynd, Youngstown, Ohio, by permission of the Court, for Retirees.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This cause is before the Court on motions to compel the payment by the Debtor of retiree benefits required by 11 U.S.C. § 1114. Subject to the provisions stated below, the Debtor shall comply with the requirements of § 1114 from any unencumbered funds which Debtor has or may obtain during this Chapter 11 case.

## I. FACTS

GF Furniture Systems, Inc. and its parent company GF Corporation filed petitions for relief under Chapter 11 of Title 11, U.S.Code, on April 18, 1990. GF Corp. and GF Furniture (referred to here as "GF" or Debtor-in-Possession "DIP") are engaged in the business of manufacturing, selling, and distributing office furniture and have manufacturing facilities in Youngstown, Ohio, Gallatin, Tennessee, and Chicago, Illinois. These cases are being jointly administered pursuant to Bankr.R. 1015(b).

In late 1989, GF began to phase out manufacturing operations at its Youngstown, Ohio, facility, in order to reduce its manufacturing costs. The company currently employs approximately 1,000 people at the two remaining manufacturing facilities, at the Youngstown, Ohio, corporate offices, and at other facilities, including 11 showrooms in various locations throughout the nation.

Due to its inability to pay current expenses and payroll, GF ceased manufacturing operations approximately one month prior to the filing of its petition. Hoping to avoid the sale of its assets at liquidation value, GF entered bankruptcy proceedings intending to sell its assets while the business is a going concern. The company quickly received authorization from this Court to borrow up to Five Million Dollars pursuant to 11 U.S.C. § 364(c) in order to restart its manufacturing operations. On June 1, 1990 the Court authorized the sale of the assets of the Tennessee and Illinois facilities. The Youngstown assets remain property of the estate.

The post-petition borrowing arrangement places several conditions on the extension of credit. These conditions require that GF use the borrowed funds only for actual start up and operating costs and that GF maintain a certain level of collections on its accounts receivable, which are the subject of a pre-petition security interest, in order for the lenders to enjoy a specified "equity cushion." These conditions, necessary for GF to receive post-petition financing, also prevent it from using any of the borrowed funds to make payments for retiree benefits.

The Court has before it two motions which seek an order directing the DIP to make the payments necessary to reinstate retiree benefits. The DIP is self-insured in

this regard. It previously made monthly payments to two insurance carriers which would administer claims and submit the allowed claims to GF for payment. Although there may be a factual dispute as to when the DIP stopped making these payments, this Court found at the May 15, 1990 hearing that it is undisputed that GF stopped making payments for retiree benefits shortly before filing its petition. Those payments continue to be unpaid. Also at the hearing on these motions, the Court determined that the United Steelworkers of America is the authorized representative for those persons receiving retiree benefits pursuant to a collective bargaining agreement. 11 U.S.C. § 1114(c)(1). Further, the Court stated that it appeared to be appropriate to appoint a committee of persons receiving retiree benefits not covered by a collective bargaining agreement pursuant to 11 U.S.C. § 1114(d). The Court appointed such a committee by an order dated May 23, 1990. That committee is the exclusive representative of such non-bargaining unit retirees. 11 U.S.C. § 1114(d). Subsequent to the May 15, 1990, hearing, an *amicus curiae* statement was filed by Ohio Senator Howard M. Metzenbaum, the chief Senate sponsor of the legislation which enacted § 1114.

## II. MOTION TO COMPEL § 1114 PAYMENTS

### A. Appropriate Vehicle

■ A preliminary question posed at the May 15 hearing was whether an action to compel the DIP to make payments under § 1114 should be made by motion or adversary proceeding. This Court agrees with the assertion of the United Steelworkers of America ("the Union") that because retiree benefits required to be made are given the status of allowed administrative expenses by 11 U.S.C. § 1114(e)(2), the issue of their non-payment may be raised in the same manner as the allowance of other administrative expenses, that is by application or motion rather than adversary complaint. *See*, Bankr.R. 2016.

### B. Appropriate Remedy

11 U.S.C. § 1114(e) provides:

Notwithstanding any other provision of this title, the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section "trustee" shall include a debtor in possession), shall timely pay and shall not modify any retiree benefits, except that—

(A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section, or

(B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments,

after which such benefits as modified shall continue to be paid by the trustee.

(2) Any payment for retiree benefits required to be made before a plan confirmed under section 1129 of this title is effective has the status of an allowed administrative expense as provided in section 503 of this title.

This section mandates that the DIP "shall timely pay" retiree benefits. It does not provide a remedy or sanction where those benefits, as here, are not paid, except for the language of § 1114(e)(2).

The Union and the retirees urge this Court to enter an order directing the DIP immediately to pay retiree benefits as required by § 1114. Neither the motions nor oral arguments in support of the motions suggested how the DIP would make such payments, nor did they suggest why a court order which merely restates the statutory mandate is appropriate. These motions simply made clear what the DIP has conceded: the payments required by § 1114 are not being made.

■ The order suggested by the Union not only raises concerns about the invasion of collateral which are discussed below, but, from a practical standpoint, it would almost certainly be ineffective. The DIP is not making retiree benefit payments; however, it is clear that it has no disposable

assets from which to make those payments. It is axiomatic that courts of equity should not enter orders which will not be effective or of benefit to litigants. *See, Virginian Ry. Co. v. System Fed'n No. 40,* 300 U.S. 515, 550–51, 57 S.Ct. 592, 600–01, 81 L.Ed. 789 (1937). As this Court noted at the hearing on this issue, an order of this Court which restates the mandate of the statute does not make that mandate more convincing. Indeed, such an order would merely postpone consideration of the central issue in this matter, namely, what remedies are available where a debtor-in-possession fails to comply with § 1114.

The usual remedies where a debtor-in-possession fails to comply with the Bankruptcy Code are conversion to a Chapter 7 case, dismissal of a case, or the appointment of a trustee or examiner. 11 U.S.C. §§ 1104, 1112. None of these remedies advances the cause of the retirees. Here, the DIP is making an effort to realize the most it can on the sale of its business as a going concern. Dismissal of this case would abort the sale in its present form and would be detrimental to the interests of the DIP and of all creditors, including retirees. Furthermore, if faced with dismissal, the DIP would likely seek to convert this case to one under Chapter 7 of Title 11. Conversion would eliminate the § 1114 issue, as that section does not apply in Chapter 7. The trustee who would inherit this business could disregard retiree benefit payments, and perhaps all pre-petition and post-conversion benefit payments would become general unsecured claims. Liquidation would, most likely, not realize as much for all creditors as would a going concern sale. In liquidation, the retirees would be in a position worse than they are in now. Finally, the conversion of this case to Chapter 7 or the appointment of a trustee in Chapter 11 adds a new layer of administrative expense, the costs of the trustee and counsel for the trustee. Considering the size and complexity of this case, the appointment of a trustee unfamiliar with this business would likely result in considerable expense to the estate.

Neither the statute nor the legislative history of § 1114 suggests any remedy other than those set out above. The Senate Report on the Retiree Benefits Bankruptcy Protection Act of 1988 which enacted § 1114 states that the purpose of the bill is "to provide additional protections for the insurance benefits of retirees, their spouses and dependants, of debtors under the Bankruptcy Code." The Report also states:

> The special treatment accorded retiree benefit payments is appropriate because of the hardship imposed on elderly recipients when such benefits are suddenly curtailed. However, this bill addresses the needs of retirees *within [the] context of the traditional structure of the Bankruptcy Code.*

S.Rep. No. 119, 100th Cong., 1st Sess. 1, 2, *reprinted in* 1988 U.S.Code Cong. & Admin.News 683, 684 (emphasis added).

Section 1114 was enacted in response to the bankruptcy filing of LTV Corporation on July 17, 1986. After filing its petition for relief under Chapter 11, LTV concluded that its obligations to provide pre-petition benefits to retirees were pre-petition unsecured claims which could not be paid without a court order or confirmed plan. Therefore, LTV stopped all payments in connection with retiree benefits as of the date of filing. *See, In re Chateaugay Corp.,* 64 B.R. 990 (Bankr.S.D.N.Y.1986) (summarizing the facts surrounding the LTV filing). This action left many retirees without health insurance, and Congress acted quickly to remedy this situation. On July 30, 1986, the Senate passed a bill which required LTV *to* reinstate benefits, and on the same day LTV applied for and received an order of the bankruptcy court permitting it to restore benefits for a six month period at an estimated cost of seventy million dollars. S.Rep. 119 at 2, 1988 U.S.Code Cong. & Admin.News p. 684; *Chateaugay,* 64 B.R. at 993. Congress then enacted interim legislation requiring companies in Chapter 11 to continue to pay retiree benefits in order to give Congress an opportunity to consider the issues raised by the LTV filing. The result of those deliberations is § 1114.

It is clearly the intent of Congress that companies in Chapter 11 would continue to pay retiree benefits unless and until a modification is ordered by the court or agreed to by the authorized representative. *See,* S.Rep. 119 at 14, 1988 U.S.Code Cong. & Admin.News p. 691. It appears that little consideration was given to the not uncommon situation where a Chapter 11 company not only has no cash on hand with which to make those payments but no unencumbered assets to which it might look for payment. The LTV bankruptcy filing, which inspired this legislation, was unlike most Chapter 11 cases in that LTV was able to pay some benefits. Section 1114 seems to speak directly to the LTV situation where the Chapter 11 business has the funds to pay at least a portion of the retiree benefits but where it is necessary to determine what modifications are necessary to permit the reorganization of the debtor. *See,* 11 U.S.C. § 1114(g)(3).

■ One bankruptcy court considered a situation similar to the present case under the interim legislation which preceded § 1114. In *In re Jones & Lamson Mach. Co., Inc.,* 102 B.R. 12 (Bankr.D.Conn.1989), Judge Alan H.W. Shiff considered an adversary proceeding brought by a union to compel the debtor to continue paying retiree benefits. The union argued that payment should be made, if necessary, from property of the debtor which was subject to a security interest in a third party. *Jones & Lamson,* 102 B.R. at 13. In *Jones & Lamson,* as here, there were no unencumbered assets available to satisfy the mandate of § 1114. The requirement that a debtor-in-possession must make § 1114 payments using pre-petition collateral would face a constitutional challenge as violative of the Taking Clause of the Fifth Amendment. Judge Shiff concluded that a construction of the statute which avoided this constitutional question is preferable. *Jones & Lamson,* 102 B.R. at 15; *see, United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74

L.Ed.2d 235 (1982). Noting the Supreme Court's finding in *Security Industrial Bank* that "[n]o bankruptcy law shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress," *Security Industrial,* 459 U.S. at 81, 103 S.Ct. at 413–14, Judge Shiff concluded as follows:

> It is clear ... that [§ 1114 [1]] only implicates the Bankruptcy Code and leaves intact those property rights derived from the operation of applicable nonbankruptcy law.... Such a reading comports with the principle of statutory construction that had Congress intended to override property rights arising under state law, [§ 1114] would have been written to expressly achieve that result, as, for example, "notwithstanding title 11 of the United States Code *and any applicable nonbankruptcy law,* the trustee shall pay...." *See, e.g.,* 11 U.S.C. §§ 541(c), 1123(a), 1142(a). In the absence of such express language, I decline to give the new law broader effect than is mandated by its plain words. Accordingly, I conclude that [§ 1114] means that a chapter 11 debtor *shall* pay benefits to retirees if there is unencumbered property from which such payments *may* be made.

*Jones & Lamson,* 102 B.R. at 16 (citation omitted; emphasis added).

■ This Court concurs with Judge Shiff's analysis and concludes that the Court may not require the DIP to invade the collateral of the lenders in order to make § 1114 payments. Similarly, this Court may not require the lenders in the present case to lend money for purposes other than those purposes which the lenders have expressly made conditions of the loan. If the Court would direct the DIP to use funds generated by its accounts receivable for the payment of § 1114 expenses, as the movants suggested at the hearing, an invasion of collateral would result, as accounts receivable are the subject of a

---

1. The language of the interim legislation mandating the payment of retiree benefits is virtually identical to that of § 1114. For this Court's purposes, Judge Shiff's conclusions are equally as persuasive as if he had considered § 1114, and passages from *Jones & Lamson* have been edited accordingly.

perfected prepetition security interest. If this Court would refuse to authorize the post-petition § 364(c) loan unless the lenders agreed to allow the funds to be used for purposes other than start up costs, it would almost certainly scuttle any opportunity the DIP once had to obtain post-petition credit. As Judge Shiff noted:

> ... a requirement that retiree benefits be paid out of a secured creditor's collateral might diminish access to pre-petition or post-petition refinancing, discourage the use of chapter 11 in the first instance, and encourage a secured creditor to seek early relief from the automatic stay. Any such consequence would not only defeat the public policy of promoting the rehabilitation of financially distressed companies, it would frustrate the legislative goal of [§ 1114] by making the payment of retiree benefits more remote.

*Jones & Lamson*, 102 B.R. at 16. Although the Union would have this Court condition the post-petition lending on the payment of § 1114 expenses, there is nothing in the legislative history of § 1114 to suggest that it was intended to discourage post-petition lending or to discourage Chapter 11 reorganization in general. Indeed, the legislative history suggests that it was the intent of Congress that § 1114 not force debtors-in-possession into Chapter 7 liquidation. 134 Cong.Rec. S6825 (daily ed. May 26, 1988) (remarks of Sen. Metzenbaum). As Judge Shiff recognized, these so called remedies are hardly remedies at all, as they make less likely the ultimate payment of retiree benefits.

The legislative history of § 1114 indicates that while benefits lost due to modification are unsecured claims, benefits required to be paid are treated as a priority administrative expense claim pursuant to 11 U.S.C. §§ 503 and 507(a)(1). S.Rep. 119 at 14, 1988 U.S.Code Cong. & Admin.News p. 691. This intention is manifested in § 1114(e)(2) which provides that any payment of retiree benefits required to be made before a confirmed plan is effective has the status of an allowed administrative expense. The granting of first priority status to such payments was often cited by members of Congress during the pendancy of the Retiree Benefits Bankruptcy Protection Act of 1988, including the comment of Senator Metzenbaum that this legislation would "move these claims to the head of the creditor line...." 134 Cong.Rec. S6825 (daily ed. May 26, 1988).

Although the granting of administrative expense priority in subsection (e)(2) may not, on its face, conflict with the directive of subsection (e)(1) that the debtor-in-possession "shall timely pay" benefits, in practice it is quickly apparent that these provisions create an inherent contradiction within the statute. In general, administrative expenses are not timely paid at all. In the case of professional compensation, for example, interim payments may be made "not more than once every 120 days...." 11 U.S.C. § 331. Furthermore, courts are generally reluctant to permit the payment of *any* administrative expenses where it appears that there may be insufficient funds to pay all these claims—because in that situation, all administrative expense claims would be reduced pro rata. *See*, 11 U.S.C. § 726(b); *In re Pacific Forrest Ind., Inc.*, 95 B.R. 740, 743 (Bankr.C.D.Cal.1989); *In re Vernon Sand & Gravel, Inc.*, 109 B.R. 255 (Bankr.N.D.Ohio 1989). Therefore, the usual procedure is to postpone payment until some time (usually after confirmation of a plan or conversion to Chapter 7) when the funds available to pay Chapter 11 administrative claims can be ascertained with some certainty.

If retiree benefits are to be paid immediately, these payments are not in the nature of administrative expenses, as their immediate payment would, in effect, grant to them a super-priority. That is, the immediate payment in full of benefits during the pendancy of a Chapter 11 case would skim these claims off the top of the fund which is available to pay all such claims, perhaps requiring the reduction of others. On the other hand, if retiree benefits are to be paid according to the procedure by which all other administrative claims are paid, they will not, in a case such as the present one, be paid in a timely fashion as Congress envisioned. Hence, from a practical

standpoint, it is impossible to give full effect to both subsections (e)(1) and (e)(2), except where it is obvious that the debtor-in-possession has adequate funds to satisfy the costs of bankruptcy administration.

The practical difficulties created by § 1114 are several.[2] As noted, there is no explicit remedy in the statute, and the treatments suggested by subsections (e)(1) and (e)(2) are inconsistent. In addition, § 1114, like its cousin, § 1113, does not contemplate a liquidating Chapter 11 plan, which is undoubtedly permitted under the Code. 11 U.S.C. § 1123(a)(5)(D); *In re Ohio Corrugating Co.*, 115 B.R. 572 (Bankr.N.D.Ohio 1990). In the present case, the DIP has not yet made a proposal which meets the requirements of § 1114(f)(1)(A).[3] However, such a proposal (as well as an order of this Court providing for modification) is dependent on the standard that "modification is necessary to permit the reorganization of the debtor...." This criterion, so key to the congressional consideration of this provision, is robbed of its meaning when the debtor proposes to liquidate or where, as here, the DIP's intention to liquidate is made evident by the necessary sale of substantial assets before plan confirmation.

These discrepancies indicate that when Congress enacted § 1114, it considered little of the workings of the Bankruptcy Code other than the situation which was immediately before it, the LTV filing. Section 1114 may speak directly to another LTV, but its application to the vast majority of cases will be much more troublesome. Unfortunately, § 1114 addresses a specific concern alone, and it is inattentive to the overall objectives of the Bankruptcy Code.

Finally, this Court notes that the uncustomary statement filed by Senator Metzenbaum, while not definitive as an expression of the intent of other members of Congress, contains views akin to those expressed in the Senate Report. The Senator, like the Union, makes the bold statement that he "urge[s] this Court to follow the intent of Congress and continue the benefits promised...." This Court wishes the intent of Congress were so easily achieved. But, as discussed above, no order of the Court will ensure that these benefits will be timely paid. Like Congress, this Court is aware of the harsh circumstances of the retirees who face the loss of their health insurance coverage. Indeed, this Court witnesses daily the hardships imposed upon all parties by the misfortunes which result in bankruptcy. But short of printing money, there is no way to see that all claims are paid in full. The Bankruptcy Code recognizes this reality and provides a method for dealing with it, and the best that this Court can do is see that *all* of the provisions of the Code are given effect. *See*, 11 U.S.C. § 105. In the present case, this means that the Court has made its best effort to enforce § 1114 in accordance with the intent of Congress while still acting within the traditional context of the Bankruptcy Code and pursuing the greatest benefit for all creditors of this estate.

### III.  CONCLUSION

■ The remedy sought by the movants is an order of this Court directing the DIP to do that which it does not have the

---

**2.**  One difficulty which the Court will not consider here is the determination of the amount of retiree benefits the statute requires the DIP to pay. Section 1114(a) defines retiree benefits as "payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits...." Here, where the DIP is self-insured and payments to the health insurance administrator have ceased, it is not immediately apparent what payments § 1114(a) contemplates, and that issue is not now before the Court.

**3.**  Section 1114(f)(1) provides: "Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall—

(A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably...."

**586**

present ability to do. The usual remedies for noncompliance with Chapter 11 of the Bankruptcy Code are conversion to Chapter 7, dismissal, or the appointment of a trustee or examiner. None of these remedies would advance the cause of the retirees here. Indeed, conversion of this case would reduce the value of the estate to liquidation value and would increase the cost of the estate by adding the expense of a trustee. It is in the best interest of all creditors, including the retirees, to permit GF to sell its assets while the business is operating. After considering the legislative history of 11 U.S.C. § 1114, it is this Court's conclusion that the only other remedy provided is the allowance of those retiree benefits required to be paid as administrative expenses pursuant to 11 U.S.C. §§ 503 and 507(a)(1). Unlike other administrative expenses, however, payment of the benefits must be made as soon as there are unencumbered assets available to make such payments.

The Court recognizes that by requiring the DIP to pay retiree benefits as soon as it has the funds to do so, the Court is, in effect, creating a super-priority without the authority of an explicit provision of the Bankruptcy Code. To do otherwise, however, would ignore the mandate of § 1114(e)(1) that the DIP "shall timely pay" these benefits. The decision of the Court today, while it may have the undesirable result of hastening the conversion of this case to Chapter 7, represents the closest adherence to the stated objectives of Congress that this Court can enforce.

In reaching this conclusion, the Court faced a true dilemma of reconciling the mandate of § 1114(e)(1) with the underlying policy of Chapter 11 which is to encourage the debtor-in-possession to reorganize in such a manner that the greatest benefit derives to *all* creditors. There is no remedy provided by law to effect the congressional desire that retiree benefits shall *always* be paid. Based on the information before the Court, the path chosen today presents the greatest likelihood that those benefits will be paid. This Court's finding that retiree benefits will accrue as first priority administrative expenses might be of little comfort to the GF retiree making the uncertain trip to the hospital today. But if this Court forces GF into a Chapter 7 liquidation, the company would be unlikely to make any other payment toward retiree benefits. If GF completes a sale in Chapter 11, there is a better chance that there will be funds available to make first priority payments to secure these benefits into the future.

The motions are sustained. The DIP shall promptly pay retiree benefits from any unencumbered funds now in its possession or which it may obtain during the pendancy of this Chapter 11 case.

An appropriate order shall issue.