**PENSION BENEFIT GUARANTY CORPORATION, Plaintiff,**

**David H. Miller and William W. Shaffer, Intervenors,**

**v.**

**The LTV CORPORATION, and LTV Steel Company, Inc., Defendants.**

**No. 87 Civ. 7261 (RWS).**

United States District Court, S.D. New York.

Dec. 4, 1990.

Pension Benefit Guar. Corp. (Carol Connor Flowe, General Counsel, Jeanne K. Beck, Deputy General Counsel, James J. Armbruster, Asst. General Counsel, Paula J. Connelly, of counsel), Washington, D.C., Cleary, Gottlieb, Steen & Hamilton (George Weisz, of counsel) New York City, for plaintiff.

Buchanan Ingersoll, P.C. (R.A. King, Kenneth R. Bruce, of counsel), Pittsburgh, Pa., Mound, Cotton & Wollan (Stuart Cotton, of counsel), New York City, for David H. Miller and William H. Shaffer.

Stroock & Stroock & Lavan (Brian M. Cogan, of counsel), Wachtell, Lipton, Rosen & Katz (Harold Novikoff, of counsel), New York City, for the Official Committee of Unsecured Creditors of the LTV Steel Co., Inc.

Blank, Rome, Comisky & McCauley (Thomas E. Biron, Raymond L. Shapiro, William E. Taylor, III, Regina Stango Kelbon, of counsel), Philadelphia, Pa., for the Subcommittee of Parent Creditors of the Official Committee of Unsecured Creditors of the LTV Corp.

Warshaw, Burstein, Cohen, Schlesinger & Kuh (Martin Lee, of counsel), New York City, for The Official Committee of Equity Sec. Holders.

O'Melveny & Myers (Robert Hayes, of counsel), New York City, for the Unofficial Bank Committee.

Davis, Polk & Wardwell (Lewis B. Kaden, Karen E. Wagner, of counsel) Kaye, Scholer, Fierman, Hays & Handler (Michael J. Crames, of counsel), New York City, Leboeuf, Lamb, Leiby & Macrae (Frank Cummings, of counsel), Washington, D.C., for defendants.

SWEET, District Judge.

On remand from the Supreme Court, plaintiff Pension Benefit Guaranty Corporation ("PBGC") moves for entry of judgment in its favor, restoring the administration of three retirement plans to defendants LTV Corporation and LTV Steel Company (collectively "LTV"). LTV opposes entry of the restoration order as it applies to one of the plans, asserting that the plan is out of money and will require immediate determination. LTV also crossmoves for declaratory judgment clarifying the financial status of all three of the plans. For the following reasons, PBGC's motion will be treated as a renewal of its prior motion for summary judgment, and as such will be granted. LTV's motion is denied.

*The Parties*

PBGC is a United States Government corporation modeled after the Federal Deposit Insurance Corporation ("FDIC"). As the FDIC insures banks and depositors' bank accounts, PBGC insures pension plans and employees' pension benefits. PBGC was created under the Section 4002 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1302.

LTV Corporation is a Delaware corporation. LTV Steel Company is a wholly-owned subsidiary, originally formed by the merger of Jones & Laughlin Steel Company, Youngstown Sheet & Tube Company and Republic Steel Corporation. Prior to the events in issue here, LTV administered a number of different pension plans, including some which it had inherited from its corporate predecessors. The three plans relevant to these proceedings are the Jones & Laughlin Hourly Plan ("J & L Hourly"), Jones & Laughlin Salaried Plan ("J & L Salaried") and the Pension Plan of Republic Steel Corporation ("Republic Hourly") (collectively "the Plans").

*The Statutory Framework*

In order to fulfill its statutory duty to protect pension plans and beneficiaries, PBGC has the power to terminate plans which are unable to pay or are in danger of becoming unable to pay benefits due to retirees. ERISA §§ 4041, 4042, 29 U.S.C. §§ 1341, 1342. Termination may be accomplished either "voluntarily" by request of the employer responsible for the plan under § 4041 or "involuntarily" without the plan administrator's agreement pursuant to § 4042. Section 4041(a)(3) specifies that voluntary termination is unavailable if it would violate the terms of a collective bargaining agreement. 29 U.S.C. § 1341(a)(3).

When PBGC terminates an employer's pension plan, either voluntarily or involuntarily, it assumes responsibility for paying all of the "nonforfeitable" benefits—benefits which have become vested at the time of termination—payable to the plan's beneficiaries. ERISA §§ 4022, 4022b, 4061, 29 U.S.C. §§ 1322, 1322b, 1361. The funding for these payments by PBGC is covered primarily by annual premiums which PBGC collects from all employers who administer pension plans covered by ERISA. ERISA §§ 4006, 4007, 29 U.S.C. §§ 1306, 1307.

Secondarily, the costs of termination are borne by the employer whose plan is terminated. When a plan is terminated under either § 4041 or § 4042, the employer who was responsible for the plan prior to termination becomes liable to PBGC for at least some portion of the funds which PBGC must pay out on the plan's behalf. ERISA § 4062, 29 U.S.C. § 1362. Due to problems which PBGC has experienced in recovering from employers under § 4062, Congress has amended this section several times to increase the amount of the employer's liability to PBGC. In January, 1987, when the Plans were terminated, the statute allowed PBGC to recover under a formula which, as applied in this case, would allow recovery of only 75% of the Plans' unfunded guaranteed benefits as of the date of termination. 29 U.S.C. § 1362(b)(1) (Supp. IV 1986).[1] The current version of § 4062 permits PBGC to recover the full amount of the Plans's unfunded benefits liability at the date of termination.[2] 29 U.S.C. § 1362(b)(1) (Supp. V 1987). Although § 4062 establishes that the employer's liability to PBGC is due and payable as of the termination date, PBGC is authorized to exercise its discretion and set up deferred repayment schedules. ERISA § 4067, 29 U.S.C. § 1367.

The final piece in the framework is § 4047, 29 U.S.C. § 1347, which authorizes PBGC to restore a plan which has been terminated, thereby relieving PBGC of any responsibility to make payments on behalf of the plan and requiring the corporation to resume its original duties to fund and administer the plan. Under § 4047, PBGC may restore a plan "in any such case in which [PBGC] determines such action to be appropriate and consistent with its duties under [ERISA.]" 29 U.S.C. § 1367.

## The Facts and Prior Proceedings

A complete description of the facts and events which have led to the present dispute is contained in the numerous prior opinions in this case, familiarity with which will be assumed. *In re Chateaugay Corp.,* 87 B.R. 779 (S.D.N.Y 1988), *aff'd sub nom. PBGC v. LTV Corp.,* 875 F.2d 1008 (2d Cir.1989), *rev'd,* —— U.S. ——, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). Regrettably, the instant motions require repetition of a number of these facts.

In 1986, faced with increasing amounts of mandatory contributions to its pension plans and with simultaneously decreasing business prospects, LTV filed for bankruptcy. As a result, the company maintained that it could not make its scheduled contributions to the Plans, and PBGC filed an action to terminate the plans involuntarily under § 4042. LTV consented to this termination, and the Plans were terminated in January of 1987.[3]

Litigation ensued between LTV and its union, the United Steel Workers of America ("USWA"), concerning the legality of the termination and how both the termination and LTV's bankruptcy affected the company's obligations to its workers and retirees under various collective bargaining agreements. In an attempt to resolve their differences and avoid a strike by the union,

---

**1.** Although the statute does authorize recovery of more than 75% of the underfunding in certain circumstances, the parties seem to have agreed, at least for present purposes, that the 75% limitation applies to this case.

**2.** Thus, one effect of the restoration here, even if followed by immediate retermination, would be to increase LTV's indebtedness to PBGC from 75% of the Plans' shortfall as of January, 1987 to 100% of the shortfall as of the eventual date of retermination. LTV asserts that this would increase its debt to PBGC from the current value of around $2 billion to something closer to $3 billion.

**3.** Because LTV's pension benefits were guaranteed under a collective bargaining agreement, § 4041(a)(3) prevented LTV from terminating the plans voluntarily.

LTV entered into a new collective bargaining agreement under which it would make up a substantial portion of the difference between the benefits which retirees were receiving under the PBGC administration of the terminated Plans and what they would have received had the Plans not been terminated. This type of agreement is described by PBGC as a "follow-on" or "wraparound" plan, because the benefits paid by LTV are intended to "follow on" or "wrap around" the amounts distributed by PBGC, allowing LTV to maintain certain of the pretermination benefits.

In September 1987, PBGC issued a Notice of Restoration for the Plans, pursuant to which PBGC would restore to LTV the full responsibility for administering and funding the Plans. PBGC claimed to have based its decision on two independent grounds: (1) LTV's improved financial condition and outlook; and (2) LTV's establishment of the follow-on plan, which PBGC described as "abusive." [4]

LTV refused to assume responsibility for the Plans and PBGC brought this action to enforce its restoration order. That action was consolidated with a bankruptcy appeal in which LTV sought a declaration that PBGC's action violated the automatic stay provision of the Bankruptcy Code. In the consolidated proceeding, LTV's appeal was denied, PBGC's motion for summary judgment was denied, the restoration decision was vacated, and summary judgment was entered in favor of LTV. *In re Chateaugay Corp., supra,* 87 B.R. 779. The grounds for the decision were that PBGC's action was arbitrary and capricious and was unsupported by the administrative record and that its reliance on the establishment of the follow-on plan as justification for restoration was improper under ERISA.

The Second Circuit affirmed, holding that PBGC's failure to consider the effect of its decision on the bankruptcy proceedings and on the collective bargaining agreements between LTV and USWA rendered the decision arbitrary and capricious and that ERISA did not authorize PBGC to restore a plan merely because the employer had established a follow-on or wraparound plan. *PBGC v. LTV Corp., supra,* 875 F.2d 1008.

On appeal, the Supreme Court reversed. The Court held that PBGC's mandate under ERISA only required it to consider the effects of its actions under that statute without having to take other federal policies into account. *PBGC v. LTV Corp., supra,* 110 S.Ct. at 2675–76. The Court also held that under ERISA § 4047 PBGC had broad discretion to determine when it was appropriate to restore a terminated plan and that nothing in the statute or the legislative history indicated that the existence of a follow-on plan was insufficient to justify restoration. *Id.* 110 S.Ct. at 2676–79. Therefore, the Court vacated the lower courts' decisions and remanded the case "for further proceedings consistent with this opinion." *Id.* 110 S.Ct. at 2681.

On August 20, 1990, the Second Circuit issued a summary order remanding the case to this court with the following direction:

> The district court's judgment did not address two of the three claims of intervenor-appellant *BancTexas Dallas, N.A.,* 875 F.2d 1008, 1014 (2d Cir.1989), and these two claims were not considered by this Court on appeal. Accordingly, we leave these for disposition in the first instance by the district court in the light of the Supreme Court's opinion.
>
> IN CONSIDERATION WHEREOF, the judgment of the district court is reversed, and the matter is remanded for further proceedings consistent with the opinion of the Supreme Court.

*PBGC v. LTV Corp.,* [914 F.2d 239 (Table) ] No. 88–6244, summary order at 2 (2d Cir. Aug. 20, 1990).

### The Present Motion

On September 27, 1990, PBGC moved for entry of judgment in its favor in light of the Supreme Court's opinion. PBGC contends that the only reason for the court of appeal's remand was its belief that the BancTexas claims remained undecided and

---

**4.** A third stated reason was LTV's demonstrated willingness to fund employee retirement plans, but PBGC later conceded that this reason was subsumed within the first two reasons.

that these claims are moot in light of the Supreme Court's decision. Therefore, it argues that no further proceedings are necessary and judgment should be entered.[5]

LTV cross-moved for declaratory judgment regarding the accounting status of funds which have been expended by the PBGC on behalf of the Plans since they were terminated in January, 1987 and a declaration that these funds do not represent net assets of the Plans and that a plan cannot be restored if it is without assets. LTV also opposes PBGC's motion on substantially the same grounds as those it advances for declaratory relief. LTV asserts that, although the Supreme Court held that PBGC's restoration decision was not invalid when it was made in September, 1987, nevertheless, it is currently impossible to restore the J & L Hourly Plan because the plan currently has no assets and would require immediate determination if restored.

According to PBGC, regardless of whether LTV's assertions concerning the Plans' current financial status are correct, the restoration order must be enforced because it was valid when entered and because changed circumstances are insufficient to justify reopening the administrative record. Because the resolution of LTV's legal contentions implies that the plans can be restored in their present condition, there is no need to address LTV's changed circumstances argument here.

## DISCUSSION

### A. The Scope of the Remand

Before reaching the questions raised by the parties, it is necessary to determine the proper scope of the present proceeding in light of the preceding events. If, as PBGC asserts, the remand is for the limited purpose of resolving the two BancTexas claims identified by the Second Circuit in its August order, and if those claims are in fact moot, then there is nothing further to do but to enter judgment as PBGC requests.

However, there is nothing in the Supreme Court's opinion which suggests that the remand is as limited as PBGC contends. The wording used by the Court—"for further proceedings consistent with this opinion"—has been held to grant a lower court broad authority in subsequent proceedings. *See, e.g., Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979). Nor is the remand from the Court of Appeals as limited as PBGC asserts. The portion of the August order quoted above indicates only that the circuit court believed that the BancTexas claims were among those remaining to be decided, not that it intended to limit the remand to these issues. Thus, even if PBGC is correct that those claims are now moot—a position which does not seem to be disputed by any of the parties on the present motion—that conclusion does not necessarily resolve these motions.

In fact, as the Parent Creditors' Subcommittee of the Official Committee of the Unsecured Creditors of LTV ("the Parent Creditors' Committee"), which joins LTV in opposing restoration of the plans, points out, the procedural posture makes it inappropriate to grant PBGC's motion for entry of judgment here without further consideration. The earlier decision in this court denied PBGC's motion for summary judgment. After the Court of Appeals affirmed, the Supreme Court reversed and vacated the judgment which had been entered on that decision, rejecting the reasoning relied upon in denying PBGC's motion. In its opinion, however, the Court did not address the question presented here, whether summary judgment should be granted, and did not decide whether other legal or factual grounds might exist which would preclude summary judgment on remand.

■ The effect, therefore, of the Supreme Court's decision is simply to reopen the original motion for summary judgment by PBGC. Consequently, PBGC's motion for entry of judgment will be treated as a

---

**5.** Plaintiff–Intervenors Miller and Shaffer have also moved for entry of judgment on their intervention complaint, which substantially the same relief as is sought by PBGC. Because PBGC's

motion is granted in all respects, judgment will also be entered in favor of the intervenors on their complaint.

renewal of this motion. In deciding the motion, the Supreme Court's opinion is controlling as the law of the case with respect to the issues actually reached on appeal. However, it does not affect those issues which were not addressed earlier, even those that might have been raised but were not. *See Quern v. Jordan, supra,* 440 U.S. at 347 n. 18, 99 S.Ct. at 1148 n. 18 (citing *Sprague v. Ticonic National Bank,* 307 U.S. 161, 168, 59 S.Ct. 777, 780–81, 83 L.Ed. 1184 (1939) and *In re Sanford Fork & Tool Co.,* 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414 (1895)); *Munro v. Post,* 102 F.2d 686, 688 (2d Cir.1939); *Banco Nacional de Cuba v. Farr,* 383 F.2d 166, 177–78 (2d Cir.1967), *cert. denied,* 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1968).

### B. The Standard for Summary Judgment

On a motion for summary judgment, the relevant inquiry is whether, on the record as it presently stands, there exists a "genuine issue as to any material fact," or whether PBGC "is entitled to a judgment as a matter of law." Rule 56(c), Fed.R. Civ.P. In deciding such a motion, the court is not expected to resolve disputed issues of fact, but to determine whether there are any factual issues which require a trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). However,

> [b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). In a case such as this, where there is admittedly a substantial dispute over the facts, the first step is to decide whether any of the disputed facts are material. *See, e.g., Estate of Detwiler v. Offenbecher,* 728 F.Supp. 103, 135 (S.D.N.Y.1989) (summary judgment granted; although non-moving party had placed many facts in dispute, none of disputed facts was material). As will be seen, the resolution of LTV's legal contentions here renders those facts in dispute immaterial at this time.

### C. Issues Presented

In opposing PBGC's motion and in support of its own cross-motion, LTV advances the following legal principles:

1. A plan may not be restored if it would have to be immediately reterminated.

2. Any advances which PBGC has made to the Plans cannot be considered assets of the Plans.

3. LTV cannot be compelled to make contributions to the Plans while it is in bankruptcy.

In addition, the Parent Creditors' Committee has asserted, both in connection with the original summary judgment motion and in opposition to PBGC's current motion, that there are a number of factual disputes which preclude summary judgment. The Committee also contends that there are a number of other factual issues which have not yet even been addressed by the parties. However, the resolution of the governing legal principles renders all of these factual issues immaterial to these motions.

### D. The Possibility of Immediate Retermination Does Not Invalidate PBGC's Decision to Restore the Plans

■ The primary basis for LTV's opposition to restoration is its contention that PBGC has no authority to restore a plan if it would be required to reterminate the plan immediately. LTV alternatively describes such restoration as "futile," "impossible" and "illegal," and accuses PBGC of violating its statutory mandate by attempting to undertake such an operation.

In support of this position, LTV points to the statement of the Supreme Court which

confined its ruling to the situation in which immediate retermination was not required:

> For present purposes, however, it is enough for us to decide that *where, as here, there is no suggestion that immediate retermination of the plans will be necessary,* it is rational for the PBGC to disfavor follow-on plans.

110 S.Ct. at 2679 (emphasis added, footnote omitted). LTV argues that in limiting its holding in this fashion, the Court implied that if immediate retermination were necessary, then PBGC's action would be impermissible.

The footnote to the emphasized portion of the statement quoted above states that "[n]o party has suggested to the Court that, *at the time of restoration,* immediate retermination, either voluntary or involuntary, was likely." *Id.* 110 S.Ct. at 2679 n. 10 (emphasis added). As this footnote makes clear, the Court did not intend to express an opinion as to whether or not retermination would be required, or whether the possibility of retermination would render restoration invalid, but dealt only with the narrow question of whether this court was correct in its 1988 ruling that PBGC's decision was improper when it was made, in September 1987.

Thus, LTV is correct in its claim that the Supreme Court did not directly address the present question. However, it does not necessarily follow that the possibility of immediate retermination is sufficient grounds for overturning the restoration decision. If anything, the opinion implies that PBGC may take any steps which it deems necessary to effectuate its anti-follow-on policy. For example, in the sentence immediately preceding the one quoted above, the Court conceded that

> if an employer's financial situation remains so dire that restoration would lead inevitably to immediate retermination, the PBGC *may decide* not to restore a terminated plan even where the employer has instituted a follow-on plan.

110 S.Ct. at 2679 (emphasis added, footnote omitted). The Court did not state that in such a situation PBGC should not restore the plan or that PBGC lacked authority to do so. The statement implies that even assuming retermination will be necessary,

it is within PBGC's discretion to decide whether or not to restore the Plans without further administrative proceedings. Moreover, although the Court made clear in the following sentence, quoted above, that the facts before it did not involve a risk of immediate retermination, an examination of the parties' briefs and the transcript of the argument before the Court indicates that both parties presented their contentions regarding the current state of the J & L Hourly Plan. Thus the Court was aware of the retermination issue.

In addition, the Court's conclusion that "PBGC's anti-follow-on policy constitutes an independent ground for the restoration decision," 110 S.Ct. at 2679 n. 11, further strengthens the implication that PBGC is not required to consider other factors—such as possible retermination—once it determines that restoration is called for because of the employer's adoption of a follow-on plan. Justice White, joined by Justice O'Connor, concurred in the holding that "the anti-follow-on policy at issue here is not contrary to [ERISA]," but dissented from the Court's ultimate decision, stating that "if the Court of Appeals was correct that PBGC's assessment of [LTV's] financial position was inadequate—and I think it was—the case should be remanded to [PBGC] to consider whether the anti-follow-on plan by itself provides sufficient grounds for a restoration order." *Id.* 110 S.Ct. at 2681 (White, J., concurring in part and dissenting in part). Justice White thus interpreted the majority's opinion as authorizing PBGC to restore the Plans in pursuit of its anti-follow-on goal without any consideration of other factors.

Finally, even if this question had been left entirely open by the Supreme Court's decision, LTV has failed to present any statutory or legislative authority for its contentions that restoration of the plans is "futile," "impossible," or "illegal." As for futility, § 4047 of ERISA grants to PBGC broad authority to restore a plan when it determines that restoration is "appropriate and consistent with its duties under" ERISA. PBGC's exercise of this power may be "futile" in practical terms if retermination will immediately follow, as seems

likely, but such action will possibly enhance PBGC's position as the parties seek to resolve the bankruptcy proceeding. The success of this effort by PBGC must await the resolution of the retermination question and any related action by the Bankruptcy Court, recognizing full well that those matters may well present a statutory conflict which may yet another time require withdrawal. *See* 28 U.S.C. § 157(d) (withdrawal necessary when conflict between bankruptcy and other federal statutes).

In view of the Supreme Court's holding, PBGC is entitled to attempt to restore the Plans before determining the effect or propriety of such action. Because PBGC has never before sought to restore a terminated plan, there is no record upon which to conclude that retermination will occur. Only time will tell how successful PBGC will prove in its restoration efforts.

Finally, there is no present authority to establish that PBGC's decision to restore the Plans is "illegal." None of ERISA's provisions requires PBGC to abstain from restoring a plan under any conditions. Therefore, LTV's complaint of illegality must wait until the time when one of the Plans requires termination and PBGC refuses to do so.

Here, as noted, it has been asserted that if the Plans are restored in strict conformity with ERISA as interpreted by PBGC, the result could well be liquidation of LTV and, necessarily, retermination of the Plans. It may be that the conflicting policies of ERISA and the Bankruptcy Code can be harmonized in the restoration process, or alternatively a conflict with the specific provisions of the Bankruptcy Code may be presented.

Once again, the principle of statutory construction set forth in *NLRB v. Bildisco and Bildisco*, 682 F.2d 72, 74 (3d Cir.1982), *aff'd*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)—in which the court stated that it was "required to accommodate the tension between two important aspects of our national policy"—may be called into play. In *United States v. Energy Resources Co.*, —— U.S. ——, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990), the Supreme Court stated, "Even if consistent with the

[Bankruptcy] Code, however, a bankruptcy court order might be inappropriate if it conflicted with another law that should have been taken into consideration in the exercise of the court's discretion." Such a determination may well lay ahead.

### E. LTV Has Failed to Establish Facts Permitting Declaratory Judgment on its Cross–Motion

█ LTV has contended that advances which PBGC has made to the Plans during the period of termination must be treated not as plan assets but rather as "loans" from PBGC which must be repaid immediately upon restoration. Therefore, LTV contends, the J & L Hourly Plan is currently lacking in assets, and will require immediate retermination.

However, as noted above, PBGC has yet to attempt to restore a terminated plan and has never had to determine how advances should be treated when a plan is restored. Nor is there anything in ERISA which clearly specifies how PBGC should recover these funds.

Sections 1367 through 1371 provide procedures and guidelines for the PBGC to collect on the liability created by plan termination. These provisions suggest that the general approach adopted by ERISA is that the liability to repay PBGC funds falls on the employer, rather than the plan.

In addition, to the extent that the advances might be understood as creating liabilities against the Plans themselves, those liabilities might be offset by corresponding liabilities from the employer to each plan. On October 23, 1990, the Internal Revenue Service and the Department of the Treasury promulgated temporary and proposed regulations relating to the minimum funding requirements for pension plans and how those requirements would apply to plans which were restored after they had been terminated by the PBGC. *See* 55 Fed.Reg. 42,704 (1990) (to be codified at 26 C.F.R. § 1.412(c)(1)–3T) (proposed Oct. 23, 1990). Because the funding of a restored plan is likely to have fallen substantially below the minimum required amounts, PBGC by its legislative mandate

must establish a restoration repayment schedule for the employer to reestablish the minimum required funding levels over a period of time of as much as 30 years. If the employer is unable to make the payments required under this extended schedule, PBGC is further authorized to grant deferral of all payments.

In the event that after restoration the employer incurs liability to the plan to repay the amount necessary to reach the minimum funding level, an asset of the plan may be created, consisting of the stream of payments scheduled by PBGC, if such can be established under the circumstances anticipated here. This asset would offset any liability which the plan had to repay PBGC.

While retermination may well be probable with respect to the J & L Hourly Plan in the absence of specific action by PBGC, LTV has failed to establish on this record how the assets of that plan will be treated and has therefore not demonstrated any present consequent futility or illegality. Thus its motion for declaratory judgment must be denied.

### F. The Future Course of this Litigation

While entry of the summary judgment directed here will terminate this chapter of the controversy, the resolution of the fundamental issue, the survival of LTV and the means by which the benefits under its pension plans are to be paid remains uncertain and a matter of national concern after more than three years of hard fought litigation. The difficulty of these issues has engaged and to date defeated the best efforts of administrators, judges, and legislators at all levels. Perhaps all parties should agree that an instance-specific global solution would be preferable to the continuation of the present trench warfare, salient by salient. The selection by the parties of an arbitrator for that purpose, either within or without any of the systems presently engaged, might prevent the fur-

ther disintegration of the proceedings and avoid the stalemate which appears to have been created.[6]

Absent such an agreement, it can only be anticipated that the capacity of our present adjudication system will continue to be strained, perhaps even beyond its limits.

### Conclusion

Because PBGC may restore a plan in pursuit of its anti-follow-on policy regardless of whether immediate retermination would be required, its decision to restore all three Plans at issue here must be enforced. For the reasons set forth above, the motions of PBGC and Miller and Shaffer for entry of judgment will be granted and the cross-motion of LTV for declaratory judgment will be denied. Settle judgment on notice.

It is so ordered.

---

**6.** The exception to the related case rule for bankruptcy appeals in the Rules for the Division of Business Among District Judges of the Southern District of New York, Rule 15(b), has contributed to this fractionated treatment by so far requiring thirteen judges of the Southern District to seek to grasp the complexities of these interrelated issues. Expedition and consistency are not served by this system, nor, considering the 24% increase in bankruptcy appeals over the last year, is the workload being more evenly distributed.