In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.

The LTV CORPORATION, for itself and on behalf of all affiliated debtors in these cases; the Official Committee of Unsecured Creditors of LTV Steel Company, Inc.; the Official Committee of Parent Creditors of the LTV Corporation; the Official Committee of Equity Security Holders; and the LTV Bank Group, Plaintiffs,

v.

PENSION BENEFIT GUARANTY CORPORATION, Defendant.

The LTV CORPORATION, LTV Steel Company, Inc., Plaintiffs,

v.

Elizabeth DOLE, Secretary of the United States Department of Labor, Defendant.

Nos. 89 Civ. 6012 (KTD), 90 Civ. 6048 (KTD).

United States District Court, S.D. New York.

Sept. 13, 1991.

Blank, Rome, Comisky & McCauley, Philadelphia, Pa. (Arnold I. Kalman, Raymond L. Shapiro, Thomas E. Biron, William E. Taylor, III, Faith Greenfield, of counsel), for the Parent Creditors' Committee of The LTV Corp.

Cleary Gottlieb Steen & Hamilton (George Weisz, of counsel), Otterbourg, Steindler, Houston & Rosen, P.C., (William M. Silverman, of counsel), New York City, for defendant Pension Ben. Guar. Corp.

Davis Polk & Wardwell (Karen E. Wagner, of counsel), Kaye, Scholer, Fierman, Hays & Handler (Michael J. Crames, of counsel), New York City, Leboeuf, Lamb, Leiby & Macrae, Washington, D.C. (Frank Cummings, of counsel), for The LTV Corp. and The LTV Steel Co., Inc.

Harold Jones, U.S. Trustee, New York City.

O'Melveny & Myers, New York City (Robert M. Hayes, Joel B. Zweibel, of counsel), for The LTV Bank Group.

Pension Benefit Guaranty Corporation, Washington, D.C. (Carol Connor Flowe, Jeanne K. Beck, William G. Beyer, Paula J. Connelly, of counsel).

U.S. Dept. of Labor, Washington, D.C. (Cynthia Caldwell Weglicki, Robert P. Davis, Sol. of Labor, Marc I. Machiz, Associate Solicitor, P.B.S.D., Sherwin Kaplan, counsel for Fiduciary Litigation, of counsel).

Strook & Strook & Lavan (Brian Cogen, Lawrence M. Handelsman, of counsel), Warshaw Burstein Cohen Schlesinger & Kuh, New York City (Edgar H. Booth, Martin R. Lee, Mary S. Zitwer, Thomas A. Draghi, of counsel), for plaintiff the Official Committee of the Equity Sec. Holders.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge.

Beginning in the early 1950's, major corporations began funding employee pensions plans. Trustees no longer required that funds be invested in employer corporations and diversified investments assuring the safest and most efficient use of the funds in order to earn benefit monies ultimately paid to employees upon retirement. These pension funds became major players in the financial marketplace, but even so, with an aging workforce, smart investment policy did not necessarily cover the benefits to be paid, particularly in those cases where funding by the employer is still incomplete.

Congress and the President, spreading a federal safety net in order to protect retiree benefits, enacted the Employee Re-

tirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Formation of the Pension Benefit Guarantee Corporation ("PBGC") was established thereunder; it was developed, among other reasons, to rescue underfunded pension plans of bankrupt corporations. ERISA guarantees payment of pensions to retirees and employees of corporations which fail or become bankrupt leaving incompletely funded pension plans, causing them to be terminated. In order for such terminated funds to make good on shortfalls, money is generated by: "insurance premiums," exacted from all pension funds, "charge-backs" assessed against defunct or bankrupt employers and officers, and as a last resort, a "call" on the United States Treasury. *See* 29 U.S.C. § 1305.

This case revolves around the bankruptcy of plaintiff Chateaugay Corporation, Reomar, Inc. and the LTV corporation (collectively "LTV"), a major nation wide conglomerate, the pension plans of which are not completely funded. The case is difficult and important because it involves fundamental questions of valuation, procedure, and methodology. Complicating matters further is the fact that such procedures have never before been decided in connection with a major bankruptcy where practically every possible type of interest is present. The resolution of these issues is of grave concern not only to the parties involved here but potentially to the national economy.[1]

On July 17, 1986, LTV and its sixty six subsidiary organizations, filed for reorganization in bankruptcy. On November 24, 1987, PBGC filed proofs of claim against LTV, after which LTV filed an adversarial proceeding in the bankruptcy court, objecting to PBGC's September 13, 1989 claims. *LTV v. PBGC,* No. 89–6122A.[2] I withdrew

---

**1.** Although the legal arguments advanced here have been very helpful, I cannot help but recognize that part of the reason underlying the government's position is occasioned by the potential call upon the Treasury and memory of the recent and on-going Savings and Loan insurance debacle.

**2.** The DOL also filed proofs of claim with the Bankruptcy Court, which were identical in priority and amount to those filed by PBGC. After the Bankruptcy Court submitted its proposed findings to this court in *LTV v. PBGC,* No. 89–6122A, LTV filed an adversarial proceeding against the DOL in the Bankruptcy Court. *LTV Corp. v. Dole,* No. 90–6305A. The reference was withdrawn from Bankruptcy Court and consol-

the reference from the Bankruptcy Court on October 17, 1989, but, in acknowledgement of Judge Lifland's familiarity with the issues and the parties, the matter was referred to him for findings pursuant to 28 U.S.C. § 157(c)(1), subject to my *de novo* review. Defendants PBGC and the Department of Labor (the "DOL") now seek review of Judge Lifland's Report and Recommendation.

Specifically, by Recommended Decision dated May 24, 1990, the Bankruptcy Court advised that: (1) federal bankruptcy law is determinative of the discount rate to be applied in calculating the present value of PBGC's claims; (2) post-petition termination of pension plans did not entitle PBGC's claims to administrative status; (3) post-petition termination of pension plans did not entitle PBGC's claims to tax or lien status; (4) PBGC must give effect to certain limits imposed by 29 U.S.C. § 1362(b) (1986); (5) PBGC is entitled to a single, non-duplicative recovery; (6) PBGC's priority claims must be set off by payments made by LTV; and (7) PBGC's trust claims, pursuant to 29 U.S.C. § 1349 (1986), must be expunged. Both PBGC and the DOL also move pursuant to Fed.R.Civ.P. 12(b)(6) for judgment on the pleadings, dismissing paragraphs 14, 15 and 17 of LTV's complaint. Additionally, LTV moves for a declaratory judgment which would include rulings that: (1) any DOL claims arising from the LTV pension plan obligations are pre-petition claims and are therefore not entitled to priority; (2) payment of such claims may only be made pursuant to a plan of reorganization; and (3) the DOL may not compel payment of LTV's pension plan obligations.[3]

## FACTS

LTV and its affiliates are principally engaged in the steel, aerospace/defense and energy products industries. LTV Steel Company, Inc. is one the country's largest steelmakers as a result of its acquisition of the Republic Steel Corporation in June of 1984, and the subsequent merger of an LTV subsidiary corporation, J & L Steel, with the LTV Steel Company, Inc. PBGC is a corporation owned by the United States government which administers the pension plan termination insurance program.

LTV filed petitions for relief under Chapter 11 of the Bankruptcy Code on July 17, 1986, in part because of the difficulty in maintaining its pension plan obligations in an increasingly competitive steel industry. 11 U.S.C. §§ 101 *et seq.* (1979 & Supp.1991). At the time that LTV filed for bankruptcy, it was the sponsor of at least the four pension plans in question here.[4] The pension plans have a wide range of benefits including those for medical and dental care, contributions to savings plans, and profit sharing. Since the time that LTV filed for bankruptcy, it has continued to operate its businesses as debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

On September 30, 1986, and January 12, 1987, PBGC moved before this court to terminate the plans after LTV filed for reorganization in bankruptcy. LTV consented to each of the terminations. Pursuant to the Bankruptcy Court's orders, LTV has been paying approximately 92% of the benefits for current retirees.[5] Subsequent-

---

idated with *LTV Corp. v. PBGC.* The DOL agreed to be bound by the Bankruptcy Court's recommendations in PBGC's case to the same extent as if it had been a party, and agreed to adopt PBGC's briefs to the extent that they addressed common issues.

**3.** The LTV Bank Group (the "Bank Group"), the Official Committee Of Unsecured Creditors (the "Unsecured Creditors"), the Official Committee Of Equity Security Holders (the "Equity Holders"), and the Parent Creditors' Committee (the "PCC") join in LTV's motions. These parties joined as plaintiffs in the adversarial proceeding in the Bankruptcy Court pursuant to that court's Case Management Order of October 4, 1989.

The PCC seeks as well to compel minimum funding contributions by LTV to the pension plans pending a final resolution in bankruptcy.

**4.** These four plans are: the Jones & Laughlin Hourly Pension Plan, the Jones & Laughlin Retirement Plan, the Pension Plan of Republic Steel Corporation of March 1, 1950, and the Republic Retirement Plan.

**5.** From July 17, 1986 to July 30, 1987, the Bankruptcy Court entered a series of orders, the Wage Order, the amendments thereto, and the 1987 Interim Labor Agreement, which authorized LTV to make a range of payment to current employees and retirees.

ly, PBGC attempted to administratively restore three of the four pension plans.[6] This restoration was ultimately permitted. *In re Chateaugay Corp.*, 87 B.R. 779 (S.D.N.Y.1988), *aff'd sub nom., Pension Ben. Guaranty Corp. v. LTV Corp.*, 875 F.2d 1008 (2d Cir.1989), *rev'd,* — U.S. ——, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), *on remand,* 122 B.R. 863 (S.D.N.Y.1990).

While the above restoration action was *sub judice* in the United States Supreme Court, PBGC took over the assets and liabilities of the pension plans, which were sponsored and administered by related debtors in the LTV bankruptcy proceeding. PBGC filed numerous claims of liability for pension plan obligations.

## DISCUSSION

The parties are in agreement that there are no issues of material fact which would prevent the court from disposing of the issues at bar.[7] *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980) (summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where there is no genuine dispute as to issues of material fact and the court may decide the issues as a matter of law).

The Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1302 (1982 & Supp.1986)[8], governs both ongoing and terminated pension plans. Under Titles I and IV of ERISA, the DOL enforces the funding requirements for ongoing pension plans. 29 U.S.C. §§ 1132(a)(5) and 1132(b)(1). Section 4002 of ERISA establishes the PBGC, a wholly-owned United States Government corporation, created to administer a pension plan termination insurance program. *See* 29 U.S.C. §§ 1301–1461.

Single employer pension plans may be involuntarily terminated by the PBGC for, among other reasons, inability by the participant to fund its employee benefits programs. 29 U.S.C. § 1342. Here, the pension plans were involuntarily terminated. When a pension plan covered by Title IV of ERISA terminates without sufficient funds, PBGC takes over the assets and liabilities of the plan and makes up any deficiency in plan assets from its own funds. PBGC funds are drawn from the annual insurance premiums paid by administrators of covered plans as well as employer liability payments collected when a plan terminates for insufficient funds. 29 U.S.C. §§ 1306, 1307, and 1362. As aforementioned, there is also a potential for a call on the Treasury if PBGC funds are insufficient to cover its liabilities.

### I. *Computation of PBGC's Claims*

An employer liability claim, as defined under ERISA, is a claim for the unfunded benefit liabilities to all participants and beneficiaries under the plan. 29 U.S.C. § 1362(b)(1). Computing proper amounts to allot claims is based upon the total amount of unfunded guaranteed benefits as of the termination date of the plan, plus interest. 29 U.S.C. § 1362(b). Unfunded guaranteed benefits constitute an amount by which the actuarial present value of guaranteed benefits exceeds the current value of plan assets allocable to payment of requisite employee benefits. 29 U.S.C. § 1301(a)(17).

■ PBGC is responsible for determining the amount of unfunded guaranteed payments under a plan when an underfund-

---

**6.** The PBGC did not seek to restore the Republic Retirement Plan.

**7.** On June 18, 1990, the Supreme Court held that PBGC could properly restore a terminated pension plan without reference to policies other than those embodied in ERISA. *Pension Ben. Guaranty Corp. v. LTV Corp.*, — U.S. ——, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). In so far as PBGC's claims were rendered moot by restoration, they were withdrawn. The following discussion therefore addresses only PBGC's claims

against the Republic Plan and the DOL's claims against the restored plans.

**8.** Congress amended Title IV of ERISA on December 22, 1987, by enacting the Pension Protection Act (the "PPA"). Subtitle D of Title IX of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330. The PPA was enacted subsequent to the events which gave rise to this litigation. This decision does not reflect the amendments.

ed plan terminates. In addition, PBGC is responsible for determining the present value of all future plan benefits, applying certain discount rates to determine termination liability, depending on when the plan must pay out benefits. 29 C.F.R. § 2619.-45(a); 41 Fed.Reg 48, 485–86 (Nov. 3, 1976). PBGC contends here that the assignment of a present value is properly an administrative decision under ERISA even though the employer is in the process of reorganization under the Bankruptcy Code.

LTV does not contest that determination of the value of the aggregate future liabilities of the plan generally is properly done by PBGC. However, LTV argues that in the context of a bankruptcy proceeding, the right of PBGC to determine its own claims for liability must be subordinated to other policies. Further, LTV argues that bankruptcy law requires interest rate assumptions, used to determine the gross value of the claims, be reflective of the market discount rate, and that this rate is properly set by the bankruptcy court, insuring equitable treatment of claims. While this case arose under ERISA, the concerns of the Bankruptcy Code must also be satisfied.

On the one hand, the Bankruptcy Code primarily looks to rehabilitate the business of the debtor/employer in a reorganization proceeding. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984). On the other hand, PBGC's primary purpose is to further the statutory goals of ERISA, encouraging the continuation and maintenance of voluntary private pension plans for the benefit of their participants. *Pension Ben. Guaranty Corp. v. LTV Corp.*, —— U.S. ——, 110 S.Ct. 2668, 2677, 110 L.Ed.2d 579 (1990) (citing to 29 U.S.C. § 1302(a)).

ERISA provides that if a conflict should arise with other federal policies, that "nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States." 29 U.S.C. § 1144. The Bankruptcy Court properly credited PBGC's ability to determine the value of the future liabilities of the plan according to its administrative pro-

cedures. PBGC's calculation of future liabilities will then be used by the Bankruptcy Court in order to set the present value of PBGC's claims. There has been no compelling information adduced by PBGC supporting the subordination of the Bankruptcy Code to the terms of ERISA.

## II. *Administrative Status of Claims*

In order for a debtor-in-possession to continue in business, the Bankruptcy Code allows certain claims and expenses first priority as "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1). Although PBGC asserts that a number of its claims are entitled to such administrative priority, the Bankruptcy Court suggested that, except to a very limited extent, PBGC's claims are not entitled to administrative priority. I agree.

██ There is a clear policy favoring ratable distribution among similar claimants. Consequently, priority status is rarely allowed. *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.1986). That which constitutes a claim, however, is broadly construed. *In re Robinson*, 776 F.2d 30, 35 (2d Cir.1985), *rev'd on other grounds*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). Under the Bankruptcy Code, a claim is defined as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured, or unsecured." 11 U.S.C. § 101(4)(A). PBGC and the DOL have stated claims here. The burden of establishing entitlement to priority, however, rests with the claimant and should only be granted under extraordinary circumstances.

██ In order to allow the debtor to start anew, a claim is deemed to exist "when the acts giving rise to the alleged liability were performed." *In re Johns–Manville Corp.*, 57 B.R. 680, 688 (Bankr.S.D.N.Y.1989). For priority status, the claimant must show that the claim arose post-petition. *Trust-*

*ees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.1986).

■ In this case, PBGC argues that its statutory obligations under the plan at bar were triggered by post-petition termination, thus according its obligations post-petition priority status. I disagree. PBGC's claims are pre-petition contingent claims because the labor giving rise to the pension obligations was performed pre-petition. The contingent right to payment arose only when the Republic Retirement Plan was terminated. There being nothing adduced here compelling me to find that these claims are post-petition, neither the DOL nor PBGC are entitled priority status of their claims. *See Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.1986) ("debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun management of the estate").

■ Neither are PBGC's pre-petition claims entitled to administrative status on the alternative theory of providing "actual and necessary" expenses of preserving the estate. *See* 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1). LTV did not induce retirees to provide post-petition services by promising pension benefits. Only those employees who provided post-petition services to LTV could benefit the company post-petition. Thus, only that portion of pension liabilities arising from post-petition labor of employees would be entitled to administrative priority as "actual and necessary" expenses of preserving the estate.

### III. *Tax or Lien Status of Claims*

■ PBGC next argues that its claims are entitled to the priority given to "any tax … incurred by the estate" post-petition. 11 U.S.C. § 503(b)(1)(B). Pursuant to 11 U.S.C. § 507(a)(7), ERISA claims are not found on the list of taxes entitled to priority in reorganization. Priority status is expressly available for ERISA claims only in a Chapter 7 liquidation. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 382 (1977); Sen. Rep. No. 989, 95th Cong., 2d Sess. 96 (1978), U.S.Code Cong. & Admin.News

1978, pp. 5787, 5882, 6338 (legislative history to 11 U.S.C. § 724 explicitly states that the provision should apply to ERISA liens in a liquidation). If Congress wanted the provision to apply outside of Chapter 7, it would have so indicated.

■ In the alternative, PBGC asserts that its claims are entitled priority lien status. ERISA provides that there shall be a lien in favor of PBGC upon all property and rights to property belonging to any person who neglects or refuses to pay, after demand, the amount of such employer liability. 29 U.S.C. § 1368(a). The statute further provides that the lien arises on the date of termination of the plan and "shall be treated in the same manner as a tax due and owing to the United States for purposes of Title 11 or section 3713(a) of Title 31." 29 U.S.C. §§ 1368(b) and 1368(c)(2). PBGC's arguments are unavailing because creation of a lien would violate the stay provisions of the Code.

As aforementioned, PBGC's claims arose pre-petition and were contingent upon plan termination on the date the bankruptcy petition was filed. ERISA provides that a lien shall arise if the employer "neglect[s] or refuse[s] to pay, after demand, the amount of such liability...." 29 U.S.C. § 1368(a). The demand is a condition precedent to the creation of the lien. Indeed, PBGC's claims never ripened into liens because such demand was not possible in light of the stay provisions of the Bankruptcy Code. 11 U.S.C. §§ 362(a)(1), (a)(5) and 362(a)(6). Specifically, § 362(a)(4) stays "any act to create, perfect, or enforce any lien against property of the estate." *See In re Parr Meadows Racing Ass'n, Inc.*, 880 F.2d 1540, 1545 (2d Cir.1989) ("[e]ven if it were possible to create and perfect a lien without any action by the [taxing authority], that lien, attaching to the property postpetition, would still violate the automatic stay."), *cert. denied sub nom., Suffolk County Treasurer v. Barr*, — U.S. —, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990).

### IV. *The Seventy–Five Percent Statutory Limit*

■ ERISA limits the amount that PBGC can recover on an employer liability

claim by an amount consisting of the employer's net worth. 29 U.S.C. § 1362(b) (1986). PBGC's employer liability claims normally include the total amount of the unfunded guaranteed benefits under a plan. *Id.* However, if those claims exceed the net worth of the employer, then the employer liability is reduced to the greater of (1) 30% of the collective net worth of the employer, or (2) 75% of the total amount of unfunded guaranteed benefits. *Id.* If an employer claims that 30% of its net worth is less than the plan asset insufficiency, the employer must submit to PBGC an estimate of its net worth and certain other related information within 120 days of the plan termination date. 29 C.F.R. § 2622.-6(a). PBGC then makes a net worth determination of the plan sponsor. 29 U.S.C. §§ 1362(d)(1)(B) and (C).

PBGC argues that although LTV claimed the net worth limitation, its failure to submit net worth estimates waived the seventy-five percent limit. However, there is nothing in the statutory language of ERISA to support this position. Accordingly, PBGC must recalculate its claims, giving effect to the limits upon receipt of the necessary information from LTV.

### V. *Exclusion of Duplicative Claims*

█ PBGC, in its individual capacity, has asserted claims for plan asset insufficiency, based on the amount by which the present value of the guaranteed benefits of the pension plans exceeds the value of the assets of the plans. A large portion of this excess is due to the fact that there has been as yet no recovery on the pension plan's unpaid contributions owed by the employer. PBGC has also asserted claims in its role as successor plan trustee,[9] for unpaid contribution claims.

LTV argues that for every dollar of unpaid contribution to the plan, PBGC is asserting claims for two dollars: one dollar claim by PBGC, in its individual capacity, for each dollar of unpaid contribution as creating a plan asset insufficiency; and one dollar claim by PBGC, in its capacity as a successor plan trustee. PBGC asserts that its claims are but estimates, adjustable upon resolution of the contribution claims.

To allow one creditor to assert two dollars in claims for every one dollar of loss from the same debtor violates principles of ratable distribution and offends notions of uniform treatment for creditors. Therefore, to the extent that unpaid contribution claims of the pension plans are allowed, any amount constituting an insufficiency claim is disallowed as duplicative.

### VI. *Priority Claims Offset By Debtor Payments*

█ The Bankruptcy Code allows as a priority an "unsecured claim for contributions to an employee benefit arising from services rendered within 180 days before the date of the filing of the petition...." 11 U.S.C. § 507(a)(4). The statute expressly does not apply to services rendered prior to the 180 day period before filing for bankruptcy. Therefore any claims by PBGC for services rendered prior to that period must be treated as general unsecured claims. *See In re Saco Local Dev. Corp.,* 23 B.R. 644, 648 (Bankr.D.Me.1982) (discussion of the 180 day limit), *aff'd,* 711 F.2d 441 (1st Cir.1983).

The extent to which a claim may be accorded priority if it falls within the 180 day period is further limited. Pursuant to § 507(a)(4) of the Bankruptcy Code, the maximum that PBGC may recover on behalf of a terminated plan is $2,000 multiplied by the number of employees covered by the plan. 11 U.S.C. § 507(a)(4).

█ At the direction of the Bankruptcy Court, LTV has made payments in the form of "fringe benefits" such as life, health, and disability insurance, as provided under §§ 507(a)(3) and (a)(4). As PBGC concedes, the aggregate amount paid by LTV to the pension plan participants under § 507(a)(3) reduces the amount that PBGC may recover under § 507(a)(4). Therefore, PBGC's claims entitled to § 507(a)(4) status must be reduced by the amount of the claims paid

---

**9.** Pursuant to 29 U.S.C. 1342(b), PBGC may act as successor trustee of a terminated plan and in that capacity seek amounts for unpaid contributions owing to the terminated plan.

to the employees directly. A determination of the amount of allowable priority is purely a question of fact which need not be determined or reviewed at this juncture.

PBGC apparently acknowledges a lack of priority as to its claims against a number of debtors which were members of a group controlled by LTV, but who were not direct employers of the employees covered by the terminated pension plan. PBGC now asks that instead of expunging those claims, reclassify them as general and unsecured. The Bankruptcy Court discussed these claims only in the context of whether they were entitled to priority under § 507(a)(4). They may now be reclassified as general unsecured claims.

### VII. *Trust Claims*

▮▮▮ ERISA requires that PBGC establish a trust for the benefit of participants in certain terminated plans. 29 U.S.C. § 1349.[10] This type of trust is used only to receive liability payments collected from the plan sponsor in order to distribute funds to eligible participants, and defray the trust's administrative expenses. 29 U.S.C. §§ 1349(a) and 1362(c). No such trust has been established with respect to the Republic Retirement Plan.

PBGC has filed contingent claims on behalf of this unborn trust, arguing that it would have been wasteful and premature to create the trust earlier, given the un-

certain status of the prior litigation over restoration. This argument is unavailing. The Republic Retirement Plan was terminated in September of 1986, yet no attempt has been made since for restoration. I will not allow the PBGC to file claims on behalf of a non-existent entity.

### VIII. *Declaratory Judgment Regarding Minimum Funding*

▮▮▮ On October 23, 1990, PBGC and the Internal Revenue Service (the "IRS") published regulations governing the minimum funding requirements for restored pension plans.[11] 55 Fed.Reg. 42,704, 42,713 (Oct. 23, 1990). These regulations authorized the PBGC to issue a proposed payment schedule in order to amortize the restored plans' unfunded liabilities. *Id.* at 42,707–08 and 42,716. PBGC issued a schedule for LTV on November 19, 1990, and requested comments from LTV and other interested parties within forty-five days. Although the payment schedule issued pursuant to the IRS and PBGC regulations is at present not in final form, the DOL intends to implement a funding schedule for the plans which have been restored.

LTV seeks a judgment declaring that the proposed repayment schedule not be used by the DOL to compel payment of pension plan obligations outside of a plan for reorganization confirmed by the bankruptcy court.[12] The DOL contends that although

---

10. This section was repealed in 1987 but still applies to pension plan terminations initiated between January 1, 1986 and December 17, 1987.

11. The restored plans at issue here are the Jones & Laughlin Hourly Pension Plan, the Jones & Laughlin Retirement Plan and the Pension Plan of Republic Steel Corporation of March 1, 1950.

12. On August 12, 1991, the DOL moved pursuant to Fed.R.Civ.P. 65 for a preliminary injunction, pending a permanent injunction, to require LTV Steel Company, Inc. and the members of its controlled group, including the LTV Corporation, to make sufficient contributions to the Jones & Laughlin Hourly Pension Plan to enable that Plan to pay its monthly pension benefits. DOL maintains that the Plans will otherwise be depleted before the LTV reorganization procedure is completed. PBGC supports this position, arguing that if LTV emerges from bankruptcy unable to sufficiently contribute to

the beneficiaries' Plans, it will be PBGC's burden to rescue the Plans. Apparently, at one time the parties agreed to an arrangement toward settlement of this dispute, without further court intervention. These "settlement negotiations" are now at a stalemate and LTV is not presently authorized by the bankruptcy court to continue paying into its plans past October 10, 1991. The PBGC and the DOL are attempting by this motion to short-circuit the reorganization process under the bankruptcy laws and in effect take total economic domination of the various debtors. As discussed above, I am not persuaded of LTV's responsibility to pay into the Plans at this juncture. PBGC is mandated by law to rescue underfunded plans. The prospect that PBGC faces the same ills that the FDIC is now facing is of no consequence; the fact is that ERISA created in the PBGC its mandate to rescue underfunded plans. I see no reason therefore to encumber the bankruptcy proceeding and to saddle LTV with a present obligation

it ultimately intends to implement the funding schedule when in final form, the motion is not ripe for adjudication because the payment schedule is not complete and no demands for payment have been made. The DOL also asserts that even if the court were to reach the merits of the issue, the DOL may properly compel payment on its claims under the public health and welfare exception to the automatic stay provisions of the Bankruptcy Code. 11 U.S.C. § 362(b)(4). I disagree.

Section 362(b)(4) of the Bankruptcy Code exempts from the automatic stay "the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power." 11 U.S.C. § 362(b)(4). Although "the continued well-being and security of millions of employees and their dependents are directly affected by [employee benefit] plans," that does not mean every act taken by the DOL is one to protect the public health and welfare. *See* 29 U.S.C. § 1001(a). Indeed, actions undertaken by the DOL to maintain funding obligations of the plans protect a purely pecuniary interest. Policy concerns as delineated by ERISA may not serve as a blanket protection circumventing stay provisions under the Bankruptcy Code where a purely pecuniary interest is at issue.[13]

IX. *The Motion To Strike Allegations From The Complaint*

 In its complaint, LTV has made certain allegations as to the financial status of the pension plans. Complaint ¶¶ 14, 15 and 17. PBGC and the DOL move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss these allegations, because they are "irrelevant to the relief requested in its complaint, and these allegations therefore fail to state a claim upon which relief may be granted."

to pay into Plan now. Remaining motions to amend and add counter-defendants will remain under advisement.

13. The Parent Creditors Committee (the "PCC") argues in the alternative that pursuant to section 1113 of the Code, limited payment of LTV Steel funding obligations must be made pending confirmation of a plan for reorganization. The PCC contends that the DOL's minimum funding claims are required under the collective bar-

DOL Brief at 19. Fed.R.Civ.P. 12(b)(6) is not the proper vehicle for the relief requested and the motions will therefore be denied.

CONCLUSION

For the foregoing reasons the Report and Recommendation of the Bankruptcy Court is adopted except insofar as noted herein. In addition, I declare that the DOL may not enforce the minimum funding contributions pursuant to the schedule and regulations set out by the IRS and PBGC. Motions by PBGC and the DOL to strike ¶¶ 14, 15, and 17 from the Complaint are denied.

SO ORDERED.

gaining agreement, and that LTV may only stop payment of those claims after complying with the requirements of 11 U.S.C. § 1113. Neither the DOL nor the unions have asserted that this section has application in these proceedings. The PCC has cited no authority to support its assertion and I am not inclined to hold that this section would permit the DOL to compel minimum funding payments due under ERISA.